MONTANA, W. & S. R. CO. v. MORLEY et al., Board of Railroad Com'rs
of Montana.

(District Court, D. Montana. March 30, 1912.)

No. 1,009.

1. CARRIERS (§ 40*)—CAR EQUIPMENT—EXTENT.

·A carrier is not required to keep a car equipment sufficiently extensive
to meet the maximum output of freight offered by shippers for trans-
portation at any part of the year, but is only required to furnish car
facilities to shippers to meet a demand adjusted and regulated to utilize
the company's car equipment with uniformity and regularity throughout
the year.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 120–122; Dec.
Dig. § 40.*

Duties and liabilities of carriers as to furnishing facilities for trans-
portation, see note to Harp v. Choctaw, O. & G. R. Co., 61 C. C. A. 414.]

2. CARRIERS (§ 12*)—RATES—REGULATION—REMUNERATIVE RATE.

Where a freight rate has been made for the future, and a reasonable
time has passed in which application of the rate to the business trans-
acted can be made to ascertain whether it will be remunerative, the ac-
tual operation of the rate will be considered in determining whether it
is remunerative or confiscatory.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec.
Dig. § 12.*]

3. CARRIERS (§ 18*)—RAILROAD RATES—REGULATION—CONFISCATORY RATES.

Judicial power will not interfere with the enforcement of a railroad
rate made by a state railroad commission under legislative authority,
unless it is clearly proven that the rate is so unreasonably low as to be
confiscatory, and therefore a violation of the carrier's rights guaranteed
by the fifth amendment of the federal Constitution.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20,
24; Dec. Dig. § 18.*]

4. CONSTITUTIONAL LAW (§§ 242, 298*)—DUE PROCESS OF LAW—EQUAL PRO-
TECTION OF LAWS—CONFISCATORY FREIGHT RATES.

A freight rate established by the state railroad commission, which will
not admit of the carrier's earning such compensation as under the cir-
cumstances is just to it and to the public, deprives such carrier of its
property without due process of law, and denies to it the equal protec-
tion of the laws in violation of the federal Constitution.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 691,
847; Dec. Dig. §§ 242, 298.*]

5. CARRIERS (§ 18*)—FREIGHT RATES—REGULATION—ESTABLISHMENT.

While the establishment of intrastate freight rates is primarily for the
determination of state authorities, the question whether rates fixed by
state authority are so unreasonably low as to deprive the carrier of its
property without just compensation is a subject of judicial inquiry in a
court of competent jurisdiction.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20,
24; Dec. Dig. § 18.*]

6. CARRIERS (§ 12*)—FREIGHT RATES—REGULATION—REASONABLENESS—DE-
TERMINATION—ELEMENTS.

Whether an intrastate freight rate is reasonable or confiscatory de-
pends on the valuation of the railroad company's property, the income
derived from the rate, and the proportion between the two.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec.
Dig. § 12.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

7. CARRIERS (§ 12*)—RAILROADS—FREIGHT RATES—VALUATION OF RAILROAD—DEPRECIATION.

In valuing a railroad to determine the reasonableness of a freight rate, a reasonable amount should be deducted from the reproductive value for depreciation.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

8. CARRIERS (§ 12*)—FREIGHT RATES—VALUATION OF RAILROAD—GOOD WILL.

Where a railroad company, owning a monopoly of transportation between certain points, the tonnage of which consisted largely of coal transported from the mines to a junction with a transcontinental had never been able to pay interest on its bonds, had accumulated only a very limited equipment, and had not prospered to any material extent, it was not entitled to an addition to its reproductive value in determining the reasonableness of a freight rate for added value as a going concern.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

9. CARRIERS (§ 12*)—RAILROAD RATES—VALUATION OF RAILROAD—BONDED DEBT.

In ascertaining the valuation of a railroad to determine whether certain rates were reasonable or confiscatory, the bonded debt of the road was neither a complete nor accurate criterion of the value of the property.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

10. CARRIERS (§ 12*)—FREIGHT RATES—REASONABLENESS—EVIDENCE.

Evidence held to require a finding that the intrastate coal rate of 35 cents a ton, fixed by the Montana Board of Railroad Commissioners for transportation of coal originating on and destined for points beyond the line of the Montana, Wyoming & Southern Railroad Company, was unreasonable and confiscatory.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

11. CARRIERS (§ 18*)—RATES—REGULATION—ESTABLISHMENT OF RATES.

In a suit to restrain the enforcement of intrastate freight rates established by a state railroad commission, the court's jurisdiction ends on finding that the rates fixed are unreasonable and confiscatory; the court being without jurisdiction to fix rates.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16-18, 20, 24; Dec. Dig. § 18.*]

In Equity. Suit by the Montana, Wyoming & Southern Railroad Company against E. A. Morley and others to enjoin the enforcement of an intrastate coal rate fixed by the Board of Railroad Commissioners of Montana. Injunction granted.

Royal E. T. Riggs, of New York City, and John G. Skinner, of Red Lodge, Mont., for complainant.

Albert J. Galen, Atty. Gen. of Montana, William L. Murphy, Special Asst. Atty. Gen. of Missoula, Mont., and J. A. Poore, Asst. Atty. Gen. of Montana, for defendants.

HUNT, Circuit Judge. This is a suit in equity brought on October 3, 1910, by the Montana, Wyoming & Southern Railroad Company against the Board of Railroad Commissioners and the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Attorney General of the state of Montana. The object is to enjoin the enforcement of a coal rate fixed by the Board of Railroad Commissioners of the state at 35 cents per ton for coal to be transported beyond the lines of the complainant's railroad. A temporary restraining order was granted, issues were framed, and by order of the Honorable Carl Rasch, then judge presiding in the Circuit Court of the United States in and for the District of Montana, reference was made to the master to take the testimony and find the facts. The theory of the bill is that the rate is so low as to be unreasonable and confiscatory and violative of the fourteenth amendment to the Constitution of the United States.

The Montana, Wyoming & Southern Railroad owns and operates a steam railroad beginning at Bridger, Carbon county, Mont., and extending in a southerly direction, following Clark's fork of the Yellowstone to Belfry, thence in a westerly direction, terminating in the coal fields at Bear Creek, Carbon county, Mont. The main line is a fraction over 25 miles in length, but the spurs and sidings aggregate 5 miles more. The road was constructed by the Yellowstone Park Railroad Company and operated from about May, 1905. Its capital stock was $3,000,000 par value, of which $2,478,000 was issued and outstanding, the bonded indebtedness of said company having been $912,000, first mortgage, 5 per cent. 30-year gold bonds. The Yellowstone Park Railroad Company never paid interest on its bonds, and was in default. The Montana, Wyoming & Southern Railroad Company is incorporated with a capital stock of $5,500,000 par value, of which $1,000,000 par value is issued and outstanding. On September 1, 1909, the company made a first mortgage of all of its property to the Empire Trust Company of New York, to secure an issue of bonds aggregating $5,000,000, bearing interest at 5 per cent. per annum, of which $900,000 of bonds were issued, and are now outstanding. On November 1, 1909, the company also made a car trust agreement, and delivered $50,000 of its bonds, receiving therefor 57 box cars of the capacity of 80,000 pounds each. The first mortgage bonds of the par value of $900,000, the equipment bonds of the par value of $50,000, and 9,990 shares of the capital stock of the complainant company amounting to $999,000, all were delivered to a bond and stock holders committee of the Yellowstone Park Railroad Company, in consideration for the sale and transfer to this complainant of the entire property of the Yellowstone Park Railroad Company, as of September 1, 1909, and also for the sale and transfer of the 57 box cars, referred to.

On July 25, 1907, the Railroad Commission of the State made an order effective August 15, 1907, establishing a rate of 50 cents per ton of 2,000 pounds as the proportional rate on through shipments of coal in car loads from points on the then line of the Yellowstone Park Railroad, and now of complainant, to points beyond its line, and thereafter, prior to January 1, 1909, the Commission reduced the rate from 50 cents per ton to 45 cents per ton, as the proportional rate. In April, 1909, hearings were had before the Commission,

on complaints against the prevailing freight rates, and an order was made on July 9, 1909, providing that on and after August 1, 1909, the local rate from points on the Yellowstone Park Railroad to Belfry and Bridger, Mont., should be 50 cents per ton, and requiring the Yellowstone Park Railroad Company to accept as a proportional rate 35 cents per ton on coal in car loads destined to points beyond its own line. After complainant acquired the property as of September 1, 1909, it asked for a rehearing, which was granted; but on February 10, 1910, the Commission denied complainant's application for an increase of rate. It appears that the Montana, Wyoming & Southern Railroad relies upon transportation of coal for its principal tonnage, that commodity furnishing 89 per cent. of the total revenue tonnage of the company. This tonnage originates on the complainant's road in the Bear Creek coal fields and is hauled to Bridger. The operation consists of hauling empty cars from Bridger to Bear Creek up grades from Belfry to Bear Creek, placing empty cars at some five coal mines, assembling cars when loaded, and hauling the loaded trains to Bridger. Owing to the grades between Belfry and Bear Creek, the haul is limited to 18 empties up the grade, and 40 loaded cars downgrade, and the conditions at the mines are such that an engine traveling in assembling cars considerably increases the mileage in addition to the haul from Bear Creek Junction to Bridger. The road owned 3 locomotives, 1 passenger coach, 5 flat cars, 5 bunk cars, 25 gondolas, 1 derrick car, 1 motor car, 2 cabooses, and 57 box cars. The master made full findings, summarizing the results of the operation of the complainant road, wherein he showed that the "corporate income" as appearing on the books from September 1, 1909, to September 1, 1910, was $32,474.05, during which period the interest on the bonded indebtedness on the first mortgage bonds and equipment bonds accrued to the amount of $47,083.34. A detail of the finding is as follows:

| | |
|---|---:|
| Revenue from transportation | $107,260 68 |
| Miscellaneous revenue from transportation | 192 00 |
| | $107,452 68 |
| Revenue from other than transportation | 2,932 38 |
| Total operating revenue | $110,385 06 |
| Operating expenses | 68,659 18 |
| Net operating revenue | $ 41,725 88 |
| Taxes accrued | 3,310 52 |
| Operating income | $ 38,415 36 |
| Miscellaneous income | 87 89 |
| Hire of equipment, Dr | 6,029 20 |
| Corporate income | $ 32,474 05 |

He found that the percentage of total operating expenses to total operating revenues in that year was 62.19 per cent.; that the business of the corporation was skillfully and economically man-

aged; that during the year complainant provided for depreciation on its equipment, ties, rails, and bridges, by properly maintaining a charge to operating expenses depreciation accounts to the amount of $10,394.15; that the annual depreciation on the complainant's property, in addition to said sum of $10,394.15, and for which provision should be made out of operating expenses, is $12,694.55; and that, if the additional sum of $12,694.55 had been properly charged in the said year (1909–10) to earnings, the corporate income for the year would have been the sum of $19,779.50. It was also found that the average cost of service per ton of commodities of all classes transported, after proper allowance has been made for depreciation, is 32.1 cents per ton; that a reasonable and just return on the value of the complainant's property was not less than the sum of 10 per cent. per annum; that the value of the complainant's real estate, based upon the average value per acre of the surrounding country used for agricultural purposes, was $44,362; that the cost of reacquiring such real estate and right of way at the time set forth in the complaint would have been twice the value of the property which it had acquired for right of way, and 1½ times the value of property sought to be acquired for terminals by reason of consequential damages necessarily paid to landowners, cost of condemnation proceedings, commissioner fees, etc.; and that the real estate should therefore be valued at $78,207. He found that the cost of reproduction of grading for roadbed and spurs was $110,028.50; that the cost of reproduction of bridges and trestles was $11,256; of culverts and waterways, $4,500; of cattle guards, road crossings, signs, and riprap, $3,290; of fences, $4,125; of telephone lines, $3,525; of switches, $11,025; of reproduction of track per mile and the mileage, $214,222.96; that the value of buildings was $21,875; and of water stations, $3,000. It was found that the cost of reproduction of real estate, grading, trestles, culverts, waterways, cattle guards, road crossings, signs, riprap, fencing, telephone, switches, track, and buildings was as follows:

| | |
|---|---:|
| Real estate | $ 78,207 00 |
| Grading | 110,028 50 |
| Trestles | 11,256 00 |
| Culverts | 4,500 00 |
| Cattle guards | 3,290 00 |
| Fencing | 4,125 00 |
| Telephone | 3,525 00 |
| Switches | 11,025 00 |
| Track | 214,222 96 |
| Buildings | 21,875 00 |
| Water stations | 3,000 00 |
| Total | $465,054 46 |

The master also found that complainant should be allowed, as a proper, necessary, and usual cost of reproduction, 10 per cent. on $465,054.46 for contingencies; that it should also be allowed 10 per cent. on $511,559 for engineering, superintendence, organization, fees, and legal expenses; that it should be allowed loss of in-

terest during construction at the rate of 5 per cent. on the sum of $562,715.89; that it should be allowed also a reasonable discount on securities issued as security for money borrowed which was placed at 15 per cent. on the amount of $562,715.89. The value of the equipment of the complainant was found to be $101,000, and the supplies on hand, $5,200. The master deducted $50,289.78 from the cost of reproduction anew in order to arrive at the value of complainant's property in its condition as it existed in September, 1909, to February, 1910. After these figures had been made, it was found that the value of the physical property of the complainant, used in its business, was $731,661.28. In addition to tangible property values, value was allowed, by reason of the organization of the complainant, its location, and because of the fact that it is transacting business. This added value was put at $135,000, which brought the total value of the property at the time of the commencement of the suit to $866,661.28. The master found that, after proper deduction for depreciation from the income of complainant $32,474.05, the corporate income from September 1, 1909, to September 1, 1910, was $19,779.50, or 2.24½ per cent. return on the valuation of $866,661.28.

In reducing the rate upon coal transported by the complainant railroad, it was the opinion of the Railroad Commission of the state, as expressed in its report dated February 10, 1910, that the carrier named was not equipped to handle the available business which the coal companies of the Bear Creek field were prepared to give it. This, the Commission said, was "owing to the very poor condition of its power * * * and the further fact that the company neither owns nor controls any cars whatever suitable for interchange with other lines of railroad, but is dependent entirely upon the disposition or ability of the Northern Pacific Railway Company to supply the equipment for their use, resulting in an exceedingly uncertain car supply, which places the mines much at a disadvantage, not knowing what to expect, and therefore unprepared to work to their maximum capacity, even on days when there are enough cars, as it is impossible to maintain a full complement of miners who under these conditions could only at best work intermittently." A remedy was then suggested in this language:

"This whole question, as found by the Commission, can be remedied by the proper equipment of the road, to the extent that it can assure the mine owners sufficient and continuous service, thus enabling the latter to extend their operations to the maximum capacity, and furnishing the said Montana, Wyoming & Southern with a much greater tonnage for transportation over its line of railroad. If this were done, there is no question but that the present rate of 35 cents per ton would be amply remunerative to pay all fixed charges, interest, etc. In fact, the following comparison of rates on the Northern Pacific should serve to dispose of any doubt on that point. The M., W. & S. gets not less than 35 cents per ton on every ton of coal handled. The rate per ton per mile, figuring 1.591 cents, while the Northern Pacific, taking into consideration the long, short and intermediate hauls to all stations within the state, averages on Bear Creek coal .689 cents per ton per mile. It will be readily seen that even with the reduced rate of 35 cents

the M., W. & S. receives 131 per cent. higher rate than the Northern Pacific on a ton mile basis."

Thus, in due course of trying the issues, it became material to inquire into the adequacy of equipment to give service to the coal shippers, and to the service conditions between September 1, 1909, and September 1, 1910. Considerable evidence was adduced upon the point before the master, and his finding is that complainant during the time mentioned gave reasonably prompt and efficient service to shippers, except during December, 1909, when extraordinary conditions prevailed, over which this complainant had no control. Examination of the testimony shows that the difficulty in December, 1909, and to an extent also in January and February, 1910, was car shortage. It appears that it is between September and February that the coal mines are most busy, and as a consequence it is during these months that the demand for cars is greatest. It was also clearly shown that the Northern Pacific Railroad, upon which it is conceded the complainant depended largely for car supply, failed to furnish enough cars to the complainant at Bridger during the months named, and that at times said company delayed moving loaded cars delivered to it at Bridger. But it appears that such conditions were due to heavy snowfalls, cold weather, and during part of December to a strike on the line of the Northern Pacific, which interfered with traffic movement of coal shipped over complainant's road. It is proved that the winter of 1909–10 was very severe. It is not disputed that on December 1, 1909, the complainant company had 63 cars of coal, which had been delivered to the Northern Pacific at Bridger; nor that there were 83 cars loaded with coal in the Bridger yards on December 2d, and that the Northern Pacific delayed moving these loaded cars until about the 6th or 7th of the month, when 55 of the 83 cars were taken out. It is also in evidence that on December 22, 1909, the Northern Pacific notified the complainant company that no cars destined to Butte or beyond would be received. This seems to have been due to strike conditions. In December, 1909, complainant ordered 1,080 coal cars from the Northern Pacific, but was only able to secure 642. The then manager of the complainant made every effort to secure additional cars, but did not get them. In January, 1910, complainant was also unable to obtain a full supply of cars, but owing to storms the cars were not supplied. It is shown that the cars which the Northern Pacific delivered to complainant at Bridger were, as a rule, promptly taken up to the mines by the complainant company. Now, inasmuch as the complainant necessarily depended on the Northern Pacific Railroad for an adequate number of cars and for the movement of any and all cars beyond Bridger, and inasmuch as it was delay in movement of freight and cars that caused the main difficulties, possession of a larger number of cars than were furnished, no matter who owned them, would not have bettered the condition; hence the question of ownership of car equipment during December, 1909, and January, 1910, loses real importance in the case.

[1] In Logan Coal Co. v. Pennsylvania Railroad Co. (C. C.) 154 Fed. 497, the following language of Judge Holland is pertinent to the situation involved:

"It is true the defendant company is required to furnish sufficient facilities at all times to transport the merchandise of shippers along its route; but it occurs in the bituminous coal mining industry in certain of the winter months of the year that the extraordinary demand for bituminous coal is far beyond the car capacity of the railroad company to transport, and it is conceded that the railroad company is not required to keep a car equipment sufficiently extensive to meet the maximum output at any part of the year, but that it is only required to furnish car facilities to bituminous coal shippers to meet a demand adjusted and regulated to utilize the company's car equipment with uniformity and regularity throughout the year."

The concession referred to in that case was made with correct understanding of the law which applies herein. After February, 1910, when the output at the mines decreased, there was adequate car service. It is of moment to recall that the mines had limited storage capacities, and on this account were dependent upon immediate supply of cars to ship the coal mined. And while there was in fact lack of cars to meet the unusual demand to transport the output in December and January, still the conditions were because of lack of movement and so largely due to the weather, to strikes in part, and to the Northern Pacific delays because of weather and strikes, that complainant ought not to be made to suffer.

[2] Again, the prediction of the Commission to the effect that better equipment and service would be followed by extension of operations and increased tonnage even at the reduced rate has not been fulfilled, for the actual experience of months of operation after the rate was reduced, during 10 months of which time there was full opportunity to move all coal mined because of ample facilities and service, has demonstrated that the coal shipments materially decreased; it appearing that between September 1, 1908, and September 1, 1909, 264,680 tons were transported, while between September 1, 1909, and September 1, 1910, there were only 251,163 tons carried.

Naturally, the Commission was called upon to act upon what then appeared to it to justify a reduction for the future. Its action was legislative in character, and, as the rate was for transportation wholly within the state, primarily the state authorities had to determine the matter. The state Commission could not accurately determine in advance what the effect of the reduction of the rate would be, but could only use its best judgment on the evidence before it, and consider whether the new rate would result in such an increase of volume of business as would make it profitable or not. But the rate having become effective for a long time, and being attacked in judicial proceedings, the court is in a better position because it has the aid of a statement of the business actually done since the rate was made effective. The rule is well established that where a rate has been made for the future, and a reasonable time has passed in which application of the rate to the business transacted can be made to ascertain whether upon the basis of the rate it will be remunerative, then a new situation is presented, and a judicial question is involved which the courts will

determine by settling the rights of the parties as they appear upon the existing facts. Chicago & Northwestern Railroad v. Dey (C. C.) 35 Fed. 866, 1 L. R. A. 744. To conclude on this branch. As the case is presented by the evidence before the master, I am constrained to hold that the complainant carrier has shown that it was not guilty of breach of duty in respect to furnishing or moving cars, and should not be held responsible for the failure on the part of another carrier, the Northern Pacific, to have furnished or moved cars promptly at the times hereinbefore referred to; and, in the light of experience of the 12 months after the order of the Commission was in effect, it is clear that the opinion of the Commission that shipments of coal would increase under the reduced rate was not correct, hence was erroneously used as a basis of action for the future rate.

[3] But, notwithstanding these things, judicial power will not interfere with the enforcement of the rate unless complainant has clearly proven that it is so unreasonably low as to conflict with the constitutional rights of the carrier, as guaranteed by the fifth amendment to the Constitution of the United States; that is to say, unless it is confiscatory. Texas & Pac. Ry. Co. v. R. R. Commission of Louisiana, 192 Fed. 280, 112 C. C. A. 538.

[4] In Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819, the Supreme Court held that a regulation, made under the authority of a state enactment establishing rates for the transportation of property by railroad that will not admit of the carrier's earning such compensation as under the circumstances is just to it and to the public, deprives such carrier of its property without due process of law, and denies to it the equal protection of the laws, and therefore becomes repugnant to the fourteenth amendment of the Constitution of the United States.

[5] The doctrine was also there announced that, while rates for the transportation of property within the limits of a state are primarily for determination by the authorities of the state, the question whether rates fixed by the authority of the state are so unreasonably low as to deprive the carrier of its property without just compensation is one not to be conclusively determined by the law-making power of the state, or by regulations adopted under the authority of the state, but may become the subject of judicial inquiry in a court of competent jurisdiction.

[6] It comes therefore to this: Whether the property of the complaining carrier has been taken and will be taken without right by the continuance of the order of the Commission depends upon the valuation of the property, the income derived from the new rate, and the proportion between the two. Prentis v. Atlantic Coast Line, 211 U. S. 210, 228, 29 Sup. Ct. 67, 53 L. Ed. 150. So it becomes necessary to get at the fair value of the complainant's railroad.

In Wilcox v. Consolidated Gas Co., 212 U. S. 52, 29 Sup. Ct. 192, 53 L. Ed. 382, the Supreme Court held that the value of the property there involved (which was real estate) was to be determined as of the time when the inquiry was made regarding the rates, and that, if the property which physically entered into the consideration of

the question of rates had increased in value since it was acquired, the company was entitled to the benefit of such increase.

Inasmuch as there are no circumstances which except the present case from the rule just cited, the court will regard the situation as it existed in February, 1910, when the Railroad Commission made its order. The complainant asked the master to accept the estimates testified to by Mr. Morris A. Zook. Mr. Zook is evidently a man of education and of unusually large experience as a civil engineer in railroad construction; and he has also devoted attention to the economics of railroads. He has been called upon to participate in the physical valuation of some of the most important railroad systems in the country, notably the New York, New Haven & Hartford. Mr. Zook proceeded upon the assumption that, in order to ascertain the value of the property of the complainant company, estimated cost of reproduction became a fundamental element. This assumption conforms with what can now be said to be the general view of the Supreme Court of the United States, as well as of distinguished economists who have written upon and testified to the subject. Nebraska Rate Case (Smyth v. Ames) 169 U. S. 546, 18 Sup. Ct. 418, 42 L. Ed. 819. But it is in applying the rule that difficulties occur.

Mr. Zook made the total cost of reproduction $891,614.31. Allowing for a depreciation of three years, he deducted $59,556.03, which left his estimate of the value of the physical property of the road upon reproduction basis at $832,066.32. He thereupon gave this testimony:

"Q. Now, Mr. Zook, in your opinion, is the cost of reproduction of a railroad, which maintains an organization and is a going concern, a proper measure of the value of that railroad? A. No, sir.

"Q. What additional elements, in your opinion, should be taken into consideration in valuing a railroad? A. Well, value is determined by use, and without use we have not any value. The element which enters into its value is the value as a going concern.

"Q. What elements go to make up its value as a going concern? A. As a going concern, the value of its organization, the value of its strategic position, the value of the development of the business and property along its line, the value of its earning capacity on a fair basis.

"Q. What do you mean by a fair basis as an earning capacity, upon what rates? A. What would be a fair return for services rendered is the earning capacity.

"Q. Would the rates allowed for similar services in other localities have any figure, in your mind, as to establishing a fair rate, from the standpoint of cost of services only? A. I think that the rates should be as good as those allowed for similar services in other localities.

"Q. Now, in your opinion, how much is the value of the Montana, Wyoming & Southern Railroad Company enhanced by its being a going concern, taking into consideration the elements you have mentioned, over and above what it would cost to reproduce its physical property? A. That is a matter of judgment, and I have assumed it to be equal to $150,000.

"Q. How do you arrive at that figure? A. That is taking a three-year period at $50,000 per year, $50,000 to be about the earning capacity for that three-year period.

"Q. That is per annum? A. Yes, sir.

"Q. And adding the value of $150,000 to the figure you have already mentioned, what amount does that give you? A. That makes a total of $982,-058.18."

On cross-examination, witness said that he took the three years as a basis because that was the usual period allowed in order to ascertain the present worth of the value of a going concern, and that he reached the conclusion that the company should do a business of $50,000 a year by examination of their reports of earnings for two years prior to 1910, which disclosed that they were earning between $40,000 and $50,000 per year. Witness was asked if, under the rates being charged for coal, 35 cents per ton on the amount of tonnage furnished to the road, it was unable to pay interest charges, fixed charges, and operating expenses, how he could put the value that he did upon the road as a going concern? He said he did not take into account the fixed charges; that, if 251,000 tons were used as a basis at 45 cents per ton, gross earnings would be $112,950. Allowing 60 per cent., or $67,-770, for operating expenses, there would be left $45,180 for earnings.

Division of Mr. Zook's statements gives us these elements in estimating value: (1) Reproducing the road as a physical thing; (2) use as a going concern; (3) strategic position; and (4) earning capacity.

It is convenient to examine these elements seriatim.

Real estate: The master's finding of $78,207 as the value of the real estate for railroad purposes appears to be sustained by evidence and to have been arrived at by consideration of the fair value of the land taken and the damages to the residue in consequence of a part of the tract having been taken for railroad purposes. The rule adopted was that for the use of the railroad twice the value of acreage property should be paid and 1½ times the value of the property for station and grounds in the vicinity of towns.

Grading: The estimate of the value of grading as found by the master was $110,028.50. There was a serious conflict in the estimates of the value of the grading due principally to discrepancies in the estimated quantity of cubic yards of earth which had been removed, and to the price per cubic yard which should be allowed for cost of removal. Mr. Zook allowed for 340,500 cubic yards at 30 cents a cubic yard, while Mr. Crookes, an engineer of experience and ability, called in behalf of respondent, estimated 242,122 cubic yards at 15 cents a cubic yard. Mr. Zook's estimate of loose and solid rock was also larger than Mr. Crookes'. The differences between these engineers arose because of the difference in methods of measurement; but Mr. Zook, when he made his estimates, had a profile map with him, showing the original contour of the ground, while Mr. Crookes did not have. They varied also in estimates of shrinkage and fills. Mr. Zook included in his estimates grading upon certain spurs and in certain yards, and grading to several of the various mines to which spurs ran, while Mr. Crookes appears to have made no estimate upon these latter matters. Mr. Zook spent 10 days in making his estimates and described with care the

manner of observation and physical measurement which he had employed in estimating the value of this and other railroads. The master's finding as to the quantity and character is well sustained by the evidence, and the price allowed by the master for the yardage is also sustained, and just.

Trestles: The estimate of $11,256 for trestles, based upon 938 linear feet at $12 a foot, was correctly found.

Culverts and waterways: The finding of the master of $4,500 as the value of culverts and waterways appears to be just, as does the estimated value of $500 for cattle guards, $170 for road crossings, $120 for signs, and $2,500 for riprap. These several findings have been worked out of the conflicting evidence of the engineers, and are all well sustained by substantial evidence.

Fencing: The item of fencing was placed by the master at $4,125. This appears to be fair.

Telephone: The master allowed $3,525 as the value of the telephone line belonging to the complainant corporation. Here again the master seems to have adopted a conservative valuation, based upon 23½ miles at $150 per mile. Mr. Zook's estimate upon this item was $200 a mile, while Mr. Crookes' was $125 per mile.

Switches: For switches the master allowed for 49 complete switches, at $225 each, the sum of $11,025. There was a discrepancy between the estimates of the engineers with respect to this item, due in part to the labor charge calculations and to guard rail costs. The master's finding will not be disturbed.

Track: The findings of the estimated cost of reproduction of track per mile were based on 20 miles with 60-pound rails; 5 miles of sidings with 60-pound rails; and 5.1 miles of track with 72-pound rails. The master allowed for 20 miles of track with 60-pound rails at $6,982.90, $139,658; and for 5 miles of 60-pound rail at $6,982.90, $34,914.50; and for 5.1 miles with 72-pound rails at $7,774.60, $39,650.46. This mileage appears to have been correctly calculated, and the allowances made by the master conform more closely to the estimates of Mr. Crookes than to those of Mr. Zook. They appear to have been based upon the evidence of actual cost of reproduction of track.

Estimates include all spikes, cross-ties (2,822 ties to the mile, at 62 cents), tie plates, track laying and surfacing, and ballasting ($500 per mile). The engineers did not agree upon the item of ballasting. The complainant's road was referred to as mud ballasted, and appears not to have been thoroughly ballasted, as railroad authorities would regard it. An estimate of $1,200 per mile to ballast the road properly was made by some of the witnesses; the weight of the testimony going to show that it would be necessary to obtain earth for proper ballasting from places other than the sides of the embankments of the road. Mr. Zook estimated $500 per mile as the cost of proper earth ballasting, but thought that the labor cost of getting earth at that rate would be no less than for gravel. The findings of the master are fully supported.

Buildings: The value of the buildings, placed at $21,875 by the

master, is sustained; so, too, is the item of $3,000 as the estimated cost of reproduction of water stations.

We have therefore as a fair estimate of the cost of reproduction the sum of $465,054.46.

Contingencies: To this sum, according to the testimony of the engineers for both parties, there should be added 10 per cent. for contingencies, or $46,505.44. By "contingencies" are meant such things as could not reasonably have been foreseen at the time of making original estimates by engineers.

Engineering, superintendence, etc.: There should also be included in the cost of reproduction an item for engineering, legal expense, and superintendence. As there is no substantial conflict in the testimony as to the propriety of this allowance, it can be included at 10 per cent. Witnesses divided it as follows: Engineering, 5 per cent.; legal expenses, 3 per cent.; superintendence, 2 per cent. This allowance may therefore stand as 10 per cent. upon $511,559.90, or $51,155.99.

Interest: The master allowed, as a necessary and usual cost of reproduction, 5 per cent. upon the sum of $562,715.89, or $28,135.79, as loss of interest during construction. This would include 5 per cent. upon the use of money for the practical total cost of reproduction, and allow a year for construction itself, or allow an average of 5 per cent. for the money used if construction extended over longer period. Complainant's evidence upon the point is to the effect that such a road could not be built with the same facility that one less isolated could be; that lack of organization, lack of transportation facilities, lack of ready material, would make reproduction slower and more expensive. Inasmuch as the justice of allowance of interest during construction is admitted, the basis of the master's finding is reasonable, and his estimate must stand. Pioneer Telephone & Telegraph Co. v. Westenhaver et al., 29 Okl. 429, 118 Pac. 354.

Discount on securities: The master allowed 15 per cent. on $562,715.89, or $84,407.38, as a necessary and usual item of cost of reproduction. There was no evidence offered on behalf of the Railroad Commission tending to dispute the conditions which the witnesses for the complainant said existed generally throughout investing communities, namely, that a railroad, such as the one under investigation, is only able to make its financial arrangements by regarding as a part of the construction cost to which it is subjected a discount representing the difference between the amount derived from the sale of its bonds and the amount which the bonds must eventually cost the company. Recognition of discounts on securities, based upon the considerations just expressed, has been made by the courts. Of course, there never could be any allowance whereby a corporation can be allowed to capitalize its own lack of credit; but where the bonds are sold at a reasonable discount, and bear a low rate of interest, it would seem to be the equivalent of selling the bonds at par with a high rate of interest. Here the 15 per cent. seems to be reasonable, the testimony showing that upon such a discount the bonds are put upon an equality in marketable conditions with the bonds of some of the very largest and most successful railroads in the country.

Equipment: There should also be included in the estimate an allowance for equipment, which, under the evidence, may be taken as found by the master, $101,000; also, for supplies on hand, $5,200.

[7] Depreciation: Following the doctrine of City of Knoxville v. Knoxville Waterworks, 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371, the master made reasonable depreciation allowances. The reason for such findings is that it is fair to deduct from the estimated cost of reproduction anew an amount which will represent the wear and tear on the property since it was put into operation. Depreciation accounts find their foundation in efforts to equalize profits during different years, so as to avoid requiring the total cost of improvements to appear as an expense of the year when such improvement proves unserviceable. The systems of estimating depreciation may differ, but the principle of the allowance for depreciation rests upon the foundation already stated. It goes without more than mention that ordinary wear and tear and decay are the principal causes for depreciation, although other factors which enter into the matter are that what is in use becomes out of date because of improvement in scientific knowledge or improved methods. Accountants and students, as well as practical railroad men, recognize the necessity for a railroad company to provide for a depreciation fund or account. The Interstate Commerce Commission, in the performance of its great services to the public and to railroad carriers as well, provides that depreciation accounts of equipment shall be kept by railroad carriers, and that there shall be included within such accounts "a monthly charge of one-twelfth of —— per cent. per annum of the original cost (estimated if not known) record value or purchase price" of equipment, to provide a fund for replacement when retired.

The master allowed what appeared on the carrier's books, namely, $10,394.15, made up of these items: Equipment, $2,555.63; rails, $1,487.76; ties, $5,279.04; and bridges and trestles, $1,071.72. This was depreciation on the books between September 1, 1909, and September 1, 1910. But he allowed the additional sum of $12,694.55 depreciation, which he found ought to have been properly charged between September 1, 1909, and September 1, 1910, to earnings, and for which provision should have been made out of operating expenses by complainant, in order that its property might not become depreciated in efficiency or value. The additional allowance was based upon testimony that the entries in the books as just heretofore stated did not truly represent the depreciation account. One expert witness said he would allow, as proper depreciation of equipment $4,955, and proper depreciation and reserve for ties, rails, bridges, and buildings, $18,153.70. In this way he arrived at the difference between what was charged and what he said ought to have been charged, or $12,-714.55. There is a slight discrepancy in these figures and those found by the master ($12,694.55), due probably to clerical error. Equipment depreciation was based upon 20 years' life for a locomotive and 5 per cent. depreciation for each year, or $1,450 for each year, with a salvage of $180 per year, or net depreciation, $1,270 per year. The depreciation allowances upon rails were based upon

percentages on the estimated weights of rails per ton and the estimated life of a rail, put at 16 years. Allowing for tie depreciation, it was estimated that at the end of 7 years the depreciation would equal the original cost of installment, the value of each tie being put at 50 cents when placed on the track, allowing a 7-year life for each tie from the time of the estimate.

Part of the additional allowance was estimated depreciation upon buildings, upon a 25-year life with no salvage, and upon culverts and trestles, on the basis of an 8-year life, or 12½ per cent.

While the additional depreciation allowance of $12,694.55 per annum accords with the evidence of complainant, and seems to justify the master's finding, yet there are so many differences in the statements of the witnesses as to the estimates, all of which depend upon opinions of what should or should not be, that it appears to be just to hold to the $10,394.15 shown on the books for 1909–10. Gathering from the evidence that different portions of the track were added at different times after 1906, and that different sidings had been built, and that some of the ties had been in the track for one, two, and three years only, estimate of wear and tear may be fairly made as of three years prior to March, 1910. The deduction for depreciation, therefore, should be three times $10,394.15, or $31,182.45.

[8] Value as a going concern: Briefly stated, the argument of complainant is that mere cost of reproduction is not by itself a proper measure of the value of a railroad; that there are such things as strategic position, organization, value of possible and probable development of business and property along its line, and earning capacity, to be considered and estimated by standards of pecuniary value. The master took this view, which has heretofore been expressed in the quoted testimony of Mr. Zook, and allowed $135,000 to cover the item.

I shall not dispute the proposition that a prosperous competing railroad doing a good business, earning substantial profits, with an established popularity, affording ample facilities for moving freight or passengers, should be valued with regard to the elements just mentioned. And this to an extent is true of a railroad which is a monopoly. Cedar Rapids Gaslight Co. v. Cedar Rapids, 223 U. S. 655, 32 Sup. Ct. 389, 56 L. Ed. 594, decided by the Supreme Court March 11, 1912. But up to the time of the inquiry into the rates involved in this case, this railroad has never paid interest upon its bonds; nor has it accumulated more than a very limited equipment; nor has it prospered to any apparent material extent. Although without a competitor, it never seems to have had to its credit a well-established business; nor did it keep up its roadbed as it should have. Its history shows that it languished and drifted into the hands of receivers. True, under complainant's ownership, it has added to its equipment and would seem to be well and economically managed, yet it is significant that its coal shipments from September, 1909, to September, 1910, were less than in the previous 12 months. Nevertheless, its principal patrons have expressed dissatisfaction with the service, and there seems to be nothing either by way of mere good will or ad-

vantage incident to the possession of a monopoly, which, although of some value, justifies present attempt to ascertain such valuation, independent of the whole structure.

Certainly the property of the Montana, Wyoming & Southern has a value independent of use or right of use. The rails, ties, switches, stations, fences, and all such things are valuable, and, unless they can be used by the complainant company in the place where they are now, their value is away below the estimates allowed by the master. It is evident, however, that, in the estimates allowed, the fact that the whole railroad is one in operation and use has been considered, and that values upon the several things have been based upon value of the railroad as in use. I am unable to see why, under the facts, at this time, there should be separation of going concern value from railroad value. Water District v. Water Company, 99 Me. 371, 59 Atl. 537; Spring Valley Waterworks v. City of San Francisco (C. C.) 192 Fed. 137. It is proper therefore that the master's finding (No. 50) should be disregarded, and it will be.

Summarizing now, and we have as the value of the physical property of the complainant used in its business for the public convenience these sums:

| | |
|---|---|
| Real estate | $ 78,207 00 |
| Grading | 110,028 50 |
| Trestles | 11,256 00 |
| Culverts and waterways | 4,500 00 |
| Cattle guards | 500 00 |
| Road crossings | 170 00 |
| Signs | 120 00 |
| Riprap | 2,500 00 |
| Fencing | 4,125 00 |
| Telephone | 3,525 00 |
| Switches | 11,025 00 |
| Track | ⎰ 139,658 00 <br> ⎱ 34,914 50 <br> 39,650 46 |
| Buildings | 21,875 00 |
| Water stations | 3,000 00 |
| Contingencies | 46,505 44 |
| Engineering, superintendence, etc. | 51,155 99 |
| Interest during construction | 28,135 79 |
| Discount on securities | 84,407 00 |
| Equipment | 101,000 00 |
| Supplies | 5,200 00 |
| Total | $781,459 06 |
| To be deducted for depreciation | 31,182 45 |
| Total cost of reproduction | $750,276 61 |

Now if we take the "gross corporate income" of the property to be $32,474.05, and accept the valuation to be $750,276.61, it will appear that the corporate income affords 4.3 per cent. return; and if we take the total revenue freight for the year 1909-10 at 281,907 tons, and divide the entire operating expenses, $77,998.90 (which include depreciation, $10,394.15, taxes, $3,310.52, car hire, $6,029.20, and miscellaneous expenses, $87.80), by the total tonnage, we find the cost per ton of freight to be 27.7 cents. From these figures it is plain that

not only was the complainant unable to meet annual interest charges on its bonded debt of $950,000, but that there was a deficit of $15,025.95. Complainant company would therefore find itself unable to meet its obligations upon a continuance of the rate of 35 cents per ton for coal, with a haul of, say, 251,163 tons.

[9] But we must not accept the amount of the bonded debt as a complete or accurate criterion of the value of the property. Reference to it may be had merely for purposes of argument. President Hadley, of Yale University, in the report of the Railroad Securities Commission to the President of the United States, dated November 1, 1911, says that:

"In so far as the value of the property is an element in rate regulation the outstanding securities are of so little evidentiary weight that it would probably be of distinct advantage if courts and commissions would disregard them entirely, except as a part of the financial history of the property, and would insist upon direct evidence of the actual money invested and of the present value of the properties."

[10] Having found that the operating expenses were no greater than were reasonably necessary, and that administration by this complainant has been had with due regard to the necessities of strict economy, and that the amount expended for supplies, wages, and salaries has been reasonable and necessary, we can go directly to estimates. We find then that a continuance of the present rate upon coal, which is 89 per cent. of the traffic carried, would mean that complainant would receive $87,907.05 revenue for coal carried. Now 89 per cent. of the total operating expenses, put at $77,998.90, is $69,419.02; and 89 per cent. of the value, $750,276.61, is $667,746.18. If coal would bear its burden of contributing, let us say, to illustrate, 10 per cent. on $667,746.18, or $66,774.61, this, when added to $69,419.02, would amount $136,193.63, which coal must yield. Deducting now the actual coal receipts (on a 35-cent per ton basis), $87,907.05, from what on our assumption coal should pay, $136,193.63, and there is a deficit of $48,286.58. To make up this deficit, the rate on coal, still estimating 251,163 tons as the tonnage to be carried, would have to be increased 19.22 cents over 35 cents per ton, or to 54.22 cents per ton.

Let us try it in another way: Accepting always that a reasonable return is one which, under honest accounting and responsible management, will attract the amount of investors' money needed for the development of railroad facilities, we have here an investment made by the owners which is evidently regarded by them as reasonably secure. They are therefore entitled to a return upon their investment which approximates the rate of interest which prevails in other lines of industry in and about that part of Montana wherein their railroad is operated. There is some uncertainty in the future of this railroad; but, on the other hand, it is proper to consider not only the coal mines, but also the probable development of the agricultural country in the valley below the coal mines, and possible strategic advantage in situation. Eight per cent. per annum is the legal rate of interest in the state of Montana, and within 2 per cent. of what bankers have testified is a rate frequently demanded upon small loans in Carbon county,

Mont., into which the railroad runs. Eight per cent. may therefore be used as a fair basis to illustrate return upon the investment. So, without fixing any rate, but merely for further illustration, we will hold to 8 per cent. Keeping to $667,746.18 as the proportion of the value of the road upon which coal should pay interest, and increasing 89 per cent. of the operating expenses by one-fourth, thus making them $86,773.77, to earn the 8 per cent., at 35 cents per ton, it would be necessary for the railroad to take in $140,193.46 on coal account, or to carry 400,552 tons, which is not far from the tonnage estimate which Commissioner Stanton, of the Railroad Commission, believed would be carried upon the reduction of the rate to 35 cents per ton. Or, using 9 per cent. as a fair return upon the value of the property, it will be necessary for the railroad to earn $146,870.92 on coal, which would require it to carry 419,631 tons at 35 cents per ton, which tonnage even more nearly approximates the estimates of Commissioner Stanton and of the mineowners themselves in estimating the effect of the reduction.

This brings out in a very strong way the fact that this controversy is the consequence of the mistaken belief of all concerned that increased tonnage would follow reduced rates.

It is recognized that, in making the above mathematical demonstration, the imposition of the burden upon coal to the entire traffic and operating expenses is necessarily arbitrary, yet it would seem to be more reasonable to reach results by the method adopted than to consider the entire road a coal road, and more accurate than to say that 89 per cent. of the traffic should pay fair return upon the entire valuation of the property.

Comparison with rates on other railroads is appropriate. The Commission fixed the rates on coal on the Yellowstone Railway Company a distance of 10½ miles at a through rate of 25 cents per ton, and on coal transported on the Montana Railroad from Lewistown to Harlowtown, a distance of 63 miles, at 90 cents per ton; from Lewistown to Oka, a distance of 50 miles, at 80 cents per ton; from Lewistown to Straw, a distance of 29 miles, at 60 cents per ton. The Commission also allowed the Northern Pacific proportional through rate from Bridger per ton of coal to Helena, Butte, Townsend, Toston, and Prickly Pear Junction, at $1.55 per ton, which was the same rate as was in force before the order herein assailed was made. It reduced the through rate from $2 per ton of coal to these places to $1.90 by deducting 10 cents per ton from the Montana, Wyoming & Southern rate per ton. Such reductions as it made in the Northern Pacific rates per ton of coal from Bridger were shown to be to places to which comparatively few coal shipments were made.

Enough has been said to demonstrate that under the order of the Commission complainant company falls far short of enjoying a reasonable return on capital invested, not to mention the element of some uncertainty which goes with the investment, and upon which the investors are justified in expecting a chance of added profit to compensate for risk.

[11] It is, however, not for the courts to assume to prescribe rates.

Their duty is generally ended when, after careful consideration of the facts of the particular case before them, and after weighing the interests of the public and of the owners of the railroad, determination is made whether the administrative authority has exceeded its constitutional power in making an order which in practical application deprives the owners of their property without just compensation. No given per cent. can be fixed by the court, as a rate to which the carrier is entitled as a matter of right. Covington, etc., Turnpike Co. v. Sanford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560. It may use percentages to illustrate, but not as fixed measures. But there must be just remuneration. Cotting v. Stockyards Company, 183 U. S. 91, 22 Sup. Ct. 30, 46 L. Ed. 92; Spring Valley Water Co. v. San Francisco (C. C.) 165 Fed. 657.

From these views, it follows that the court must hold that the order made is an infringement of the constitutional rights of the carrier, in that it deprives it of a fair return upon the reasonable value of its property while in use for the public. In so far as it is necessary to modify the findings of the master to conform with the views herein expressed, such modification will be deemed made.

Decree of injunction will issue.