## DENVER UNION STOCK YARD CO. v. UNITED STATES et al.

### No. 9568.

District Court, D. Colorado.
April 4, 1932.

SYMES, District Judge, dissenting in part.

Robert G. Bosworth, Norman A. Hutchinson, and Pershing, Nye, Tallmadge, Bosworth & Dick, all of Denver, Colo., for petitioner.

John Lord O'Brian, Asst. to the Atty. Gen., William G. Davis and Wendell Berge, Sp. Assts. to the Atty. Gen., and Ralph L. Carr, U. S. Atty., of Denver, Colo., Elton L. Marshall, Sol., Department of Agriculture, C. E. Miles, and G. N. Dagger, all of Washington, D. C., for respondents.

Before McDERMOTT, Circuit Judge, and KENNEDY and SYMES, District Judges.

McDERMOTT, Circuit Judge.

The Secretary of Agriculture, pursuant to the Packers and Stockyards Act of 1921 (7 USCA § 181 et seq.), entered into an inquiry into the lawfulness and reasonableness of the charges made by the Denver Union Stock Yard Company for services rendered by it to its patrons. Pursuant to notice, extensive hearings were held before an examiner, the record of those hearings consisting of 2,023 pages, together with 82 exhibits. On July 28, 1931, Hon. R. W. Dunlap, Acting Secretary of Agriculture, entered the order which is under attack in this litigation, accompanied by carefully prepared and comprehensive findings of fact. By this order, the yardage charges imposed by the petitioner were substantially reduced.

Prior to its effective date, the petitioner filed this suit to set aside and permanently enjoin the enforcement of said order. Issues were joined, and the cause came on for hearing before a three judge court as required by section 316 of the Packers and Stockyards Act (7 USC 217 [7 USCA § 217]). The only evidence offered was the record made before the Secretary of Agriculture. The bill alleges that its existing rates were not unreasonable; that the finding of the Secretary to that effect is without support in the evidence, and that the Secretary was therefore without power to establish any rate; that the Secretary is without statutory power to value the properties of the petitioner, or to determine the reasonableness of a return upon that value; that the notice is insufficient; that, in determining the reasonableness of the return, the Secretary erred in many respects; that by reason thereof the petitioner has been deprived of its property without due process of law.

Scope of Review.

The parties are in disagreement as to the scope of this judicial review, the petitioner contending that it is the duty of this court to try the case de novo, and to exercise our independent judgment upon all of the questions of fact submitted to the Secretary for his determination. The respondent, on the contrary, contends that our review is limited to the question of whether the Secretary acted within the scope of his statutory powers, and as to whether there is substantial evidence to support the findings of the Secretary.

Section 316 of the act (7 USCA § 217) provides that provisions of the Interstate Commerce Commission "are made applicable to the jurisdiction, powers, and duties of the Secretary in enforcing the provisions of this title, and to any person subject to the provisions of this title." Stafford v. Wallace, 258 U. S. 495, 512, 42 S. Ct. 397, 66 L. Ed. 735, 33 A. L. R. 229; Tagg Bros. v. United States, 280 U. S. 420, 443, 50 S. Ct. 220, 74 L. Ed. 524. The authorities

cited by the parties may perhaps be reconciled, if the ground of the attack upon the order is considered. An order of the Secretary may be attacked in court on either one of two grounds, or both.

■ (a) The attack may be based upon the ground that an order "rests upon an erroneous rule of law, Interstate Commerce Commission v. Diffenbaugh, 222 U. S. 42, 32 S. Ct. 22, 56 L. Ed. 83, or is based upon a finding made without evidence, Chicago Junction Case, 264 U. S. 258, 263, 44 S. Ct. 317, 68 L. Ed. 667, or upon evidence which clearly does not support it, Interstate Commerce Commission v. Union Pacific R. R. Co., 222 U. S. 541, 547, 32 S. Ct. 108, 56 L. Ed. 308; New England Divisions Case, 261 U. S. 184, 203, 43 S. Ct. 270, 67 L. Ed. 605; Colorado v. United States, 271 U. S. 153, 166, 46 S. Ct. 452, 70 L. Ed. 878." Tagg Bros. v. United States, 280 U. S. 420, 442, 50 S. Ct. 220, 225, 74 L. Ed. 524.

Such an attack must be determined upon the record of the proceedings before the Secretary, and it is not competent for a court to receive additional evidence.

■ (b) Or an order may be attacked upon the ground that it deprives the petitioner of its property without due process of law. Where the attack is made upon constitutional grounds, a court is required to exercise its independent judgment as to both law and facts. United Railways v. West, 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390; Lehigh Valley R. R. v. Commissioners, 278 U. S. 24, 26, 49 S. Ct. 69, 73 L. Ed. 161, 62 A. L. R. 805; Chicago, B. & Q. R. R. v. Osborne, 265 U. S. 14, 44 S. Ct. 431, 68 L. Ed. 878; Bluefield Co. v. Pub. Serv. Comm., 262 U. S. 679, 683, 43 S. Ct. 675, 67 L. Ed. 1176; Georgia Ry. v. R. R. Comm., 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144; Ohio Valley Co. v. Ben Avon Borough, 253 U. S. 287, 289, 40 S. Ct. 527, 64 L. Ed. 908; Lincoln Gas Co. v. Lincoln, 223 U. S. 349, 32 S. Ct. 271, 56 L. Ed. 466.

In Crowell v. Benson, 52 S. Ct. 285, 296, 76 L. Ed. —— Chief Justice Hughes, speaking for a majority of the court, said: "In cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function. The case of confiscation is illustrative, the ultimate conclusion almost invariably depending upon the decisions of questions of fact. This court has held the owner to be entitled to 'a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both law and facts.' "

■ Constitutional rights may be as successfully and as seriously invaded by mistakes of fact as by mistakes of law. When a citizen asserts that the rights guaranteed him by the Constitution have been invaded, the responsibility rests upon the courts to hear him, and he cannot be denied a hearing on the ground that his claim rests upon a question of fact. Where such a claim is made, the petitioner is entitled to present all of the material facts. After hearing him, it may be determined that the notice and hearing which he has had before an administrative tribunal complied with the essentials of due process. Den ex dem. Murray v. Hoboken Land & Improvement Co., 18 How. 272, 15 L. Ed. 372; United States v. Ju Toy, 198 U. S. 253, 263, 25 S. Ct. 644, 49 L. Ed. 1040. But in the case at bar we are not dealing with an administrative hearing of matters judicial in nature, the determination of rights on existing facts. We are dealing with an exercise of legislative power. The petitioner has had no hearing, before any tribunal, as to whether the legislative order of the Secretary invades its rights. We are compelled, therefore, to hear the evidence and to decide for ourselves whether the order of the Secretary deprives petitioner of its property without due process of law (Const. Amend. 14).

■ However, there is a presumption that the findings of the Secretary are correct. Banton v. Belt Line Ry., 268 U. S. 413, 422, 45 S. Ct. 534, 69 L. Ed. 1020. In Cotting v. Kansas City Stock Yards Co., 183 U. S. 79, 91, 22 S. Ct. 30, 35, 46 L. Ed. 92, Mr. Justice Brewer said: "It [the Supreme Court] has also ruled that the determination of the legislature is to be presumed to be just, and must be upheld unless it clearly appears to result in enforcing unreasonable and unjust rates." See, also, Cambridge Electric Light Co. v. Atwill (D. C.) 25 F.(2d) 485, and cases therein cited. This evidentiary rule is a branch of the accepted doctrine that legislative acts will not be held to be unconstitutional unless they are clearly so. This legal presumption is strengthened in this case by the fact that the report of the Secretary bears internal evidence of the careful investigation made by him, and his disposition to be fair.

## The Notice.

The petitioner contends that, under the notice served, the Secretary was powerless to inquire as to the reasonableness of yardage charges, but was limited to an inquiry into the reasonableness of charges made for feed. The notice recited that a hearing would be had "upon the reasonableness and lawfulness of the rates and charges as provided for by said Tariff No. 2, as amended by Supplements Nos. 1 and 2." The supplements dealt with charges for feed. Tariff No. 2, referred to in the notice, concerns yardage charges, and on its face the notice is ample to advise the petitioner that an inquiry would be made into yardage charges. The argument of petitioner is that the yardage charges contained in tariff No. 2, were identical with the yardage charges contained in tariff No. 1, which had been published many years before; that therefore tariff No. 2 made no change as to yardage charges.

The petitioner contends that the only section which authorizes the Secretary to institute an inquiry into the "lawfulness" of a rate is section 306 (7 USC 207 [7 USCA § 207]), and that that section deals exclusively with new or changed rates; that, the rates in tariff No. 2 being neither, the Secretary is without the power to inquire as to their lawfulness. Section 310 (7 USC 211 [7 USCA § 211]) gives the Secretary power either on his own initiative or upon complaint to prescribe a just and reasonable rate for services, upon a finding that existing rates are "unjust, unreasonable, or discriminatory." The power of the Secretary under this section is ample, and is not confined to new or changed rates. The objection that this section does not use the word "lawfulness," while the notice does contain such word, is hypercritical in the extreme. No surprise is claimed, and no further mention need be made of the matter, other than to suggest that the notice is sufficient if the word "lawfulness" is treated as surplusage. The power of the Secretary to inquire at any time into the reasonableness of existing charges, either upon complaint or upon his own initiative, is conferred by the statute in express terms, and has been sustained by the courts. Tagg Bros. v. United States, 280 U. S. 420, 50 S. Ct. 220, 74 L. Ed. 524.

## The Power of the Secretary.

The petitioner further contends that the power of the Secretary to establish a reasonable rate does not confer upon him the power to value the properties of the petitioner, nor to take into account, at least as a dominant factor, the return upon the value of such property. The petitioner supports this contention by excerpts from the opinion of Judge Brewer in Cotting v. Kansas City Stock Yards Co., supra, in which the learned justice stated that rates to be charged by stockyard companies for their services were not to be measured by the same rules that govern in the consideration of rates exacted by those utilities which exercise the power of eminent domain and discharge a purely public service. The decision of the court in that case was upon an entirely different ground, and six of the justices declined to join in that part of the opinion relied on by the petitioner. The petitioner further supports this contention by reference to the order made by the Secretary of Agriculture, as to the stockyards rates at St. Paul, Minn. The Secretary there held that he was not required to hold a rate unreasonable because it yielded more than a given percentage of return upon the value of the property involved; that the act did not treat financial success as an evil, nor seek to prevent it; that, while the cost of rendering the service may be a large, or even a controlling factor in determining the reasonableness of rates, consideration should be given to other factors.

The burden of the petitioner's complaint is that the order of the Secretary deprives it of a fair return upon its property. Undoubtedly it is the duty of the Secretary, in fixing a rate, to avoid confiscation. Conceding that the Secretary of Agriculture has the power to consider many elements in arriving at a reasonable rate, it is nevertheless his duty to see to it that the rate fixed does not confiscate the property of the petitioner. Just how the Secretary can discharge that duty without a valuation of the property of petitioner is not clear. It is urged that the statute does not in express terms authorize the Secretary to ascertain the valuation of properties used and useful in the public service; many persuasive authorities are cited to the proposition that such power as is here conferred should not rest upon implication. But the conclusion does not follow. The power is conferred upon the Secretary to establish reasonable rates. No rate is reasonable which is confiscatory. The Secretary cannot determine what rate is reasonable until he has first determined whether it would result in confiscation. He cannot determine the question of confiscation

without a valuation of the properties of the petitioner.

The reliance upon the order of the Secretary of Agriculture in the St. Paul case indicates a confusion of legislative and judicial functions. When Secretary Jardine issued his order in the St. Paul case, he was exercising legislative power. In the exercise of such power, Secretary Jardine was well within his rights in giving consideration to various factors; the value of the service rendered, competition, rates exacted by other yards in comparable situations, and the other considerations suggested by Justice Brewer in the Cotting Case. But this court does not exercise legislative power. This court exhausts its power when it determines the validity of the order made. Our power of review is limited to an inquiry into the question of whether the order made is within the power granted by the statute, whether the order was made after notice and upon substantial evidence, and whether it is confiscatory of the petitioner's property. Petitioner urges that the "value of the service" is the test of reasonableness. If the rate exceeds the value of the service, there will be no patrons. The argument of petitioner comes to the proposition that it is entitled to charge all that the traffic will bear. But the object of regulation is to prevent an essential industry from exacting an unreasonable charge for its services, even though the patron would prefer to pay the charge exacted rather than do without the service. A reasonable rate lies somewhere within a field which has the value of a service as one extreme, and confiscation as the other. A reasonable rate must at least be sufficient to pay a fair return on property devoted to the public use, with proper allowance for deterioration and obsolescence, and which must allow for the hazards involved in the particular business. If such a rate is allowed, new capital will be attracted from the security of bonds, and the necessary public service can be continued. We conclude that it was not only the right, but the duty, of the Secretary, in passing upon the reasonableness of the rates, to determine whether such rates were confiscatory of the property of the petitioner.

### Value of Real Estate.

It is earnestly and vigorously contended that the Secretary erred in arriving at the valuation of the real estate of the petitioner. The evidence upon this question in-volved the usual conflict in expert evidence, and a reading of the record leaves the same confusion that generally is left in the wake of such evidence. The petitioner employed three qualified real estate dealers, who made an independent investigation of the properties, and arrived at a valuation of each of the tracts after consultation. The Secretary called one witness, a man of the very highest standing, of unquestioned integrity, and of long experience. There was evidence of sales of real estate in the general vicinity, within comparatively recent periods, which tends to support the finding of the Secretary. It is vigorously contended that such properties were not as valuable as the properties of the petitioner. It is likewise contended that the witnesses for the Secretary did not give proper weight to certain factors, just as it is contended that the witnesses for the petitioner gave weight to factors that should not be considered. It would unduly extend this opinion, and serve no useful purpose, to discuss these respective contentions in detail. It will suffice to say that we have read the abstract of the evidence upon this point, and, while it is unquestionably true that the evidence would have justified a considerably larger valuation, we are not prepared to say that the Secretary's finding in this respect is clearly erroneous. We are not satisfied that the witness for the government adopted a theory in opposition to the rules laid down in the Minnesota Rate Cases, 230 U. S. 352, 445, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18.

### Value of Structures.

In the valuation of structures, the Secretary determined the present value of the structures, and not the investment therein. In arriving at the present value, he received evidence as to the cost of reproduction as of the time of the inquiry, and applied to that figure the then per cent. condition of the property. The fairness of the inquiry is demonstrated by the fact that the reproduction figures of the government engineer correspond almost exactly with those of the engineer for the petitioner. The only substantial difference between the figures of the two engineers on general overheads concerned the item of interest during construction. The government engineer allowed no interest on the value of the real estate during the construction period, but the Secretary did allow such item, in accordance with the evidence of the engineer for the peti-

tioner. There was also a difference between the engineers as to the probable period of construction. The Secretary's finding of the reproduction cost of the structures is as follows:

| | |
|---|---|
| Totals of materials and labor.. | $2,393,796.00 |
| Omissions and contingencies... | 97,551.00 |
| Engineering and superintendence | 102,429.00 |
| Legal Expense | 20,486.00 |
| General Office | 40,972.00 |
| Liability Insurance | 21,616.00 |
| Taxes during construction | 34,050.00 |
| Interest during construction (7% on property other than land for one-half construction period) | 77,221.00 |
| Interest on land (7% on value of used and useful land for one year) | 40,991.00 |

Total reproductions new cost of respondent's used and useful structures and equipment...$2,829,112.00

■ *Promotion Expense.* The petitioner contends that to these sums should be added an item of $26,790 for "initial promotion"; $18,982.65 for "organization" and $160,-721.95 for "assembling capital." There is no evidence that any sum was expended with respect to any of these items. Galveston Elec. Co. v. Galveston, 258 U. S. 388, 397, 42 S. Ct. 351, 355, 66 L. Ed. 678. The argument is predicated upon the proposition that, if it became necessary to rebuild the plants now, it would be necessary to employ the services of promoters, and to allow for certain discounts in the sale of bonds or stock. That it is entirely proper for a rate-making body to make some allowance for such probable costs is entirely clear. An examination of the cases discloses that such allowance is frequently made and sustained by the courts. Whether it is confiscatory to make no allowance therefor is more troublesome. In Brooklyn Borough Gas Co. v. Prendergast (D. C.) 16 F.(2d) 615, a three judge court set aside a rate order and approved a master's report which held such allowance must be made. In Ben Avon Borough .v. Ohio Valley Co., 260 Pa. 289, 103 A. 744, the Superior Court was reversed because it held that the Commission erred in declining to make such an allowance. The Supreme Court reversed the Pennsylvania court. Id., 253 U. S. 287, 40 S. Ct. 527, 64 L. Ed. 908. Thereupon, the Superior Court again made the allowance, and it was

affirmed. Id., 271 Pa. 346, 114 A. 369. See, also, Montana, W. & S. R. Co. v. Morley (D. C.) 198 F. 991. Ohio Utilities Co. v. Pub. Utilities Comm., 267 U. S. 359, 45 S. Ct. 259, 69 L. Ed. 656, held that preliminary legal and organization expenses must be allowed; but these are covered in the item of $20,486 in our case. On the other hand, in the Galveston Case, supra, it was said:

"The other item included by the master in determining base value, but disallowed by the court, is $67,078 for brokerage fees. There is no evidence that any sum was in fact paid as brokerage, and there was included, as above shown, the sum of $73,281 for organization and business management in calculating the historical reproduction cost. The finding of the master rests upon testimony that bankers customarily get, in some form, compensation equal to 4 per cent. on the money procured by them for such enterprises. But compensation for bankers' services is often paid in the lessened price at which they take the company's securities, and is thus represented in the higher rate of interest or dividend paid on the money actually received by the company as capital. The reason given by the master for including the allowance for an assumed brokerage fee, is that a brokerage fee is 'a normal incident of large industrial investments and has not been amortized,' since 'the record shows that the plant has been operated at a loss.' If base value were to be fixed by the money expended, brokerage fees actually paid might with propriety be included, as are taxes paid pending construction. But as the base value considered is the present value, that value must be measured by money; and the customary cost of obtaining the money is immaterial. We cannot say that the court erred in refusing to include in base value an allowance for hypothetical broker's fees."

This seems to be an authority directly in point; moreover, it appears to us to be the sound rule. It must be remembered that the problem before the Secretary is the ascertainment of present value; that, while the estimate as to reproduction cost new is an aid in the ascertainment of present value, it is not in itself the end that is sought. These promotion expenses are predicated upon the assumption that in 1930 no stockyards existed; that it was necessary to rebuild them from the ground up as of that date; and upon the further assumption that no one is available who is willing and able to invest his money in the enterprise. It is

quite as fair to assume that this theoretical plant, built in 1930, is constructed by a phantom man with mythical cash, which would make it unnecessary to allow an additional value on account of an apocryphal commission paid on hypothetical bonds.

**Per Cent. Condition.** After arriving at the reproduction cost new of the properties, the Secretary found that the properties were in 83.8 per cent. condition. Here again there was a conflict between the engineers. Both engineers inspected the properties, and from their informed and skilled judgment made an estimate as to the present per cent. condition of the properties. The engineer for the petitioner estimated that the properties were in 95 per cent. condition. Mr. Henrici, the government engineer, is unquestionably a man of standing in his profession, and his evidence undoubtedly reflects his deliberate opinion. Both engineers followed the approved method of arriving at their conclusions. Wichita Gas Co. v. Public Service Commission, 126 Kan. 220, 268 P. 111. When it is considered that many of the structures are more than 40 years old, the Secretary's finding in this respect appears to be entirely fair.

**Going Concern Value.** To these values, the Secretary added the sum of $143,000 for working capital, and the sum of $295,000 for going concern value. The petitioner contends that the Secretary should have allowed the sum of $807,000 for going concern value. The petitioner introduced the evidence of an engineer who undertook to compute going concern value from a number of assumptions. The engineer assumed that the stockyards was completed, but with no business attached. He then undertook to estimate what it would cost to procure the business which the stockyards now enjoys. The engineer interviewed five men for the purpose of getting their opinion as to the number of years it would take to regain the business. These estimates ranged from 7 to 12 years. The engineer believed that these estimates were too high, and started with the assumption that within five years the business would be attached. Upon these assumptions, he computed the going concern value. This is buttressed by the evidence of certain witnesses that in the past certain expenditures were made for advertising, and by donations of land, which aggregate approximately the same amount. The Supreme Court of the United States in Galveston Elec. Co. v. Galveston, 258 U. S. 388, at page

395, 42 S. Ct. 351, 354, 66 L. Ed. 678, has said: "The fact that a utility may reach financial success only in time or not at all, is a reason for allowing a liberal return on the money invested in the enterprise; but it does not make past losses an element to be considered in deciding what the base value is and whether the rate is confiscatory."

The government introduced no witness who gave his opinion as to going concern value; but the history and value of the stockyards were before the Secretary, and from them he could form a judgment as to that value. He was not bound to accept the opinion evidence offered. The Secretary recognized that there is a value to a going concern that is not reflected in the physical structures, and allowed approximately 10 per cent. of the physical values. That such a value exists, which should be recognized, is abundantly settled. McCardle v. Indianapolis Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316; Bluefield Co. v. Pub. Serv. Comm., 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176; State of Missouri ex rel. Southwestern Bell Tel. Co. v. Pub. Serv. Comm., 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; Denver v. Denver Union Water Co., 246 U. S. 178, 191, 192, 38 S. Ct. 278, 62 L. Ed. 649; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 165, 35 S. Ct. 811, 59 L. Ed. 1244; City of Omaha v. Omaha Water Co., 218 U. S. 180, 202, 203, 30 S. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084; National Waterworks Co. v. Kansas City (C. C. A. 8) 62 F. 853, 865, 27 L. R. A. 827; Michigan Bell Telephone Co. v. Odell (D. C. Mich.) 45 F.(2d) 180, 185; Whittaker v. Brictson Mfg. Co. (C. C. A. 8) 43 F.(2d) 485; Illinois Bell Telephone Co. v. Moynihan (D. C. Ill.) 38 F.(2d) 77.

The situation in the McCardle Case is almost exactly similar to the situation here presented. The engineers for the company made their estimate of going concern value. The engineer for the commission made no appraisal of such value. The commission allowed a going concern value of 9½ per cent. of the values of the physical property. This finding was sustained, and in respect thereto the Supreme Court said, at page 415 of 272 U. S., 47 S. Ct. 144, 150: "The evidence is more than sufficient to sustain 9.5 per cent. for going value. And the reported cases showing amounts generally included by commissions and courts to cover intangible elements of value indicate that 10 per cent. of the value of the physical elements would

be low when the impressive facts reported by the commission in this case are taken in- ·to account.".

The Supreme Court of the United States has approved of allowances of going concern value, as indicated by the following table:

property in condition to render service. The engineer and the accountant for the government were more liberal to the petitioner in estimating the life of the various properties involved, but adopted the sinking fund, or compound interest theory of deprecia-

| | Cost of Reproduction | | Amount allowed For Going Concern Value | Per cent. of Going Concern Value to cost of Reproduction |
|---|---|---|---|---|
| Knoxville v. Water Co., 212 U. S. 1, 29 S. Ct. 148, 53 L. Ed. 371. | $ 538,000 | | $ 60,000 | 11.1 |
| Omaha v. Omaha Water Co., 218 U. S. 180, 30 S. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084. | 5,700,583 | | 562,712 | 9.9 |
| Denver v. Denver Union Water Co., 246 U. S. 178, 38 S. Ct. 278, 62 L. Ed. 649. | 10,617,782 | | 800,000 | 7.5 |
| Georgia Railway v. R. R. Comm., 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144. | 5,250,000 | | 441,629 | 8.4 |
| Bluefield Co. v. Pub. Serv. Comm., 262 U. S. 679, 686, 43 S. Ct. 675, 67 L. Ed. 1176. | 324,423 | | 32,442 | 10.0 |
| McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316. | 14,904,000 | | 1,366,000 | 9.17 |

■ There may be businesses in which it is possible to compute with some degree of accuracy this element of value; but, even if accurate computation is not possible, a value which actually exists should not be ignored because of the difficulty of its measurement. There is no rule by which the value of a leg or an arm can be accurately measured in dollars and cents, nor by which pain and suffering can be computed; yet triers of fact do evaluate such things. By the same token, difficulty of measurement should not amount to a denial of right. If the Secretary had not erroneously excluded certain properties from the rate base, we would have no disposition to disturb the Secretary's finding as to going concern value; since the rate base was quite apparently a factor in his finding of going concern value, an addition to the rate base would necessarily increase this value.

■■■ *Depreciation Reserve.* The Secretary allowed $47,000 as an annual expense item for the purpose of establishing a depreciation reserve. The petitioner contends that he should have allowed at least $73,320 for such purpose. The petitioner's engineer ascribed to certain of the properties a determinate life; estimated the length of that life; and calculated the depreciation reserve on a straight line basis, that is, he calculated the annual amount which, if collected each year of its estimated life, would equal the value of the property at the end of its estimated life, with no allowance for interest on the fund so created. The petitioner's engineer ascribed to certain other property an indeterminate life, and estimated that it would require $15,000 a year to keep such

tion, by which they arrived at the conclusion that the sum of $42,014 a year, with interest accumulations, would create a fund sufficient to restore the properties as and when their usefulness terminated. The Interstate Commerce Commission has adopted the straight line basis for depreciation reserves in telephone and steam railroad companies. Dockets 14,700 and 15,000, decided July, 1931. The compound interest theory may work out substantial justice before it is necessary to use the fund to replace structures. As soon as it is used for that purpose, the utility has a new structure to take the place of the one that has worn out in the public service, but it no longer has that part of the fund. In properties of age and varying life, the difficulties of computation are serious; it would seem that, if the utility was charged with the actual income, if any, arising from investment of funds in the reserve, it would answer the purpose. But we deem it unnecessary to enter into a discussion of the relative merits of the straight line as compared with the compound interest theory of figuring depreciation. The estimate of an engineer as to the probable life of a structure is only some evidence bearing upon the question of fact to be decided, and that is, What amount should be allowed as an operating charge to provide for the replacement of property which may become useless, either on account of physical deterioration or obsolescence? We do not understand that such engineer's estimates is the only evidence which it is competent for the trier of the facts to consider. In Smith v. Illinois Bell Tel. Co., 282 U. S. 133, 51 S. Ct. 65, 72, 75 L. Ed. 255, the Supreme Court of the United States held that "the

experience of the Illinois Company * ÷ * should afford a sound basis for judgment as to the amount which in fairness both to public and private interest should be allowed as an annual charge for depreciation."

In Gender, Paeschke & Frey Co. v. Commissioner (C. C. A. 7) 41 F.(2d) 308, 310, the Commissioner of Internal Revenue had allowed depreciation at the rate of 5 per cent., computed on the straight line basis. There was evidence that certain machines had been in use as long as 45 years, and were still rendering proper service. Concerning this that court said: "Theoretically this is quite a safe procedure in the absence of better evidence; but in this particular case there were machines that had been in use as long as forty-five years and were still rendering proper service, due to keeping them in good repair and promptly replacing all broken parts, and making such renewals as were necessary. This fact proves conclusively that no rule or rate can in all instances accurately measure depreciation. While it may form a safe basis for a prima facie case, it must give way to the facts in each particular case if those facts are presented and are inconsistent with the rate."

In addition to the evidence of the engineers, the Secretary had before him the fact that the cost of retirements and replacements of property during the preceding nine years had averaged $4,371 annually. True, the amount of property that is replaced in one or two years has no bearing on its probable life; but, where the property is of varying ages and nature, an experience of nine years may have some evidentiary value. The Secretary had evidence that much of the property was susceptible of maintenance by minor repairs which were properly charged to expense rather than to capital. It appeared that the petitioner had, for a period of twelve years, set up on its books an average depreciation of about $45,000 a year. The Secretary made an allowance for an annual depreciation charge of $47,000 a year. Considering the fact that the Secretary found that this property, after a great many years of useful life, is still in 83.8 per cent. condition, and considering the small amounts which had been actually expended thereon for replacements during the past nine years, we are of the opinion that the Secretary's allowance is supported by the evidence.

 *Rate of Return.* The Secretary found that 7½ per cent. was a fair return.

The petitioner introduced evidence that the capital structure of such a property as the petitioner's would involve bonds, preferred stock, and common stock; and, by a compilation of the interest and dividend rates that would be necessary on all securities, arrived at the conclusion that anything less than 10 per cent. on the full valuation would be an unreasonably low rate. This means that the common stock, carrying the risk of the entire investment, would receive much in excess of 10 per cent. But we do not think that the return upon properties used and useful should be increased or decreased because of the capital structure of a particular owner. We think the Secretary's method of allowing a percentage upon the value of the property used and useful in the public business, without respect to the capital structure, is permissible. Otherwise the rates of two identical properties would vary accordingly as one owner had issued bonds or preferred stock and the other owner had not. It seems to us that a 7½ per cent. return is a minimum. It must be remembered that no return at all is assured; the effect of the order is to grant permission to earn that sum, if the owner is able so to do. We have some doubt whether, as conditions are presently, capital could be attracted from investments which assure 5 or 6 per cent., backed by a large margin of safety, to an enterprise which offers only a permission to earn a maximum of 7½ per cent. The history of the petitioner discloses considerable fluctuations in earning power from year to year. While we have doubt whether a permissive rate of 7½ per cent. is sufficient to attract capital, it is, after all, a matter of opinion, and we resolve the doubt in favor of the Secretary's finding. The Secretary knows what a vital service these stockyards render to his particular charges, the farmers and the cattlemen; he knows the hardship that it would entail if they were deprived of the services of such institutions. The Secretary has no desire to strangle the petitioner, and, if doubt exists as to its ability to survive, he must have resolved those doubts in its favor. In any event, we are not disposed to hold his order invalid on account of the rate of return.

Complaint is also made because, in restating the expenses of the petitioner, the Secretary disallowed certain items paid as interest on bonds. This amount is provided for in the rate of return allowed upon the entire value of the properties of petitioner.

This leaves for consideration three questions: (a) The exclusion of properties from the rate base; (b) charging to income, revenue which the Secretary held should be received from services rendered to traders or dealers; and (c) the propriety of predicating rates for the future upon the experience of a single year.

### Properties Excluded from the Rate Base.

The Secretary excluded from the rate base certain properties which the petitioner acquired in good faith and in the exercise of sound business judgment, for the purposes of its business. By denying the petitioner a right to earn a return thereon, the Secretary has, as a practical matter, denied the petitioner the right to own them, for it is mathematically certain that, if the petitioner is not permitted to earn a return upon the value of such properties, it cannot afford to keep them. Some one must pay the taxes on these properties, and some one must pay a return upon the investment therein. If the petitioner is not permitted to earn sufficient funds from the only business which it has, to pay these carrying charges, then it cannot own them, for the stockholders cannot be expected to impair their capital investment on this account. These properties divide up into three classes.

(a) *Vacant Land Acquired for Expansion.* The stockyards are favorably located with reference to railroads and highways, and with due regard to the olfactory senses of the residents of Denver. Packing houses and other business enterprises have grown up around it. The evidence is undisputed that during the 45 years of its history, while there have been cycles of good years and bad years, nevertheless there has been a general upward trend in the business. The evidence is likewise undisputed that the petitioner has about, if not quite, reached the limit of its present facilities. During the times of the peak load, the facilities are not now adequate. The directors of the petitioner undoubtedly realized that land must be acquired for expansion in the immediate future, and that such land must be adjacent to the present plant, and that the amount of such adjacent and vacant land was limited; the directors further realized that the petitioner had no power of eminent domain, and that, if they waited until the demand was absolute, they would be at the mercy of the owners; they realized further that such vacant land might be improved at any time by the owners; which would add greatly to the cost when the necessity became acute. In this situation, there can be no question but that it was sound business judgment, in the interest of the corporation and its patrons, to acquire this adjacent real estate while it was cheap and unimproved; and the Secretary has so found. To have waited until the adjacent property was improved, or until the owners could have taken advantage of its imperative need, would be to saddle upon the patrons an extravagant and unnecessary load. Confronted with this situation, the petitioner acquired at a reasonable price tracts of vacant ground, suitable for expansions that were reasonably deemed to be necessary reasonably soon. Plans had been prepared for construction on one tract of 19.825 acres and on another of 12.64 acres; other tracts had been acquired for material yards and to increase the facilities for trackage and railroad car storage. Without discussing the tracts excluded in detail, it is sufficient to say that the evidence discloses without dispute that all of them were acquired in good faith, and for the purposes of such expansion of its facilities as the directors believed to be reasonably imminent. The petitioner owned no other land available for expansion.[1] The question of the right of the Secretary to exclude these properties from the rate base is, on this record, a question of law. There is no doubt, as contended by counsel for the respondents, that the Secretary has some power to decide how much additional land or property may be acquired for expansion purposes, and, if the directors acquire more property than can reasonably be said to be necessary for the purposes of expansion for any reasonable period in the future, the Secretary has power to disallow it. But no such question is presented by this record. On the contrary, the Secretary has proceeded upon the theory that no land can be included in the rate base, unless it is in actual use. We quote from the Secretary's findings: "If the respondent deems it the part of sound business management to hold land for possible future expansion, that policy is not questioned in this proceeding. When that land is brought into use as a result of the additional business the rates charged for services will then compensate the respondent for the use of the land upon

---

[1] In the stockyards area there are numerous plots which are not occupied, aggregating 4½ acres. In any improved district there are such plots, which are either deliberately left for the purposes of light and ventilation, or for the reason that the shape of the plot is such that some waste space is unavoidable. These many interspersed plots are not available nor suitable for expansion, and the Secretary does not so find.

its value as of the time it is brought into use."

■■■ We think the Secretary erred in this respect. The rule undoubtedly is and must be that the power to regulate rates does not confer upon the Secretary the power of management of the affairs of the corporation. In providing for telephone facilities to a new addition, it is the part of wisdom to lay a cable that will provide services for customers that may reasonably be expected to be attached in the future; in constructing office buildings, school buildings, and federal buildings, public authorities deliberately plan such buildings to accommodate the anticipated needs of the future. To do otherwise is to be short-sighted and wasteful. There is no rule of law that denies to the directors of a stockyards company or of a telephone company the right to use ordinary business judgment in the conduct of the affairs of the corporation. The rule of law adopted by the Secretary would deny to a telephone company the right to include in its rate base the value of any cable that was laid, unless every wire in the cable was in actual service; it would deny to an electric power company the right to include in the rate base the value of the power plant, unless it was being operated to its maximum capacity. Such a rule does not conform to sound business methods, nor to the rules of law as laid down by the courts.

The report of the Special Committee of the American Society of Civil Engineers, dealing with the valuation of public utilities, states (volume 81, pp. 1341–1349):

"Clearly it is a narrow construction of the law to claim, as has sometimes been done, that all property not actively in use at the time of the valuation should be excluded. A broader policy is desirable, both in the interests of the owner of the property and of the public. The property considered to be devoted to the public use, and therefore to be valued, should include, not only that in active use in the every-day operations, but that which is properly and reasonably held in reserve to insure the sufficiency and continuity of the service.

"Recognizing that the erection of manufactories and other buildings, the opening of new streets, the laying out of parks, and the making of other customary improvements in the neighborhood of public utilities, as well as increases in the value of adjoining property, will make the future acquisition of lands for the expanding needs of such public utilities difficult and expensive, if not impossible, it has been customary for public utilities to exercise foresight in the purchase of surplus land at crucial points, and in the opinion of the Committee it is in the interest of both the owner of the property and of the public that such land, purchased in good faith and held in reserve for future use, should be included in the valuation, even though portions are for a time not in active use.

"It is poor business judgment to build a gas plant, an electric plant, a railroad shop yard, or other like property, on land just sufficient to hold the buildings and other improvements immediately necessary, without reasonable provision for expansion. The history of all properties that have been built in response to reasonable demand for their services has been a history of growth, development, and expansion. Good business policy would provide for this expansion so far as it can be reasonably anticipated, and all property should be included which is not in excess of a reasonable amount for development of the business over a reasonable period of time in advance of the valuation. Such a determination is not a matter of pure speculation. An investigation into the history of the growth, expansion of business, and expansion of physical property of the company, together with a consideration of existing conditions at each site, should easily determine the reasonableness of the inclusion.

"In most of the commission decisions stress is laid on the necessity of providing adequately for future needs in order that satisfactory service may be furnished continuously, and it is stated that it is not desirable in the general interest of consumers to discourage a reasonably liberal provision for the future.

"It is the judgment of the Committee that there should not be a reduction in the valuation on account of excessive size or capacity, except when the excess is so great as to be clearly unreasonable and is the result of not using proper foresight. * * * If the opposite course is pursued, corporations may be deterred from making wise provision for the future, thereby increasing the hazard of the investor, probably increasing the ultimate cost by reason of premature retirement, duplication, or piecemeal construction, and hence ultimately increasing the cost of service to the public."

In Texas Midland Railroad Valuation Case, 75 I. C. C. 1, 161, it was held: "Any rule which would discourage railroads from

exercising proper foresight in the purchase of lands which will be needed for terminal facilities in the future development of their properties would be most unfortunate, for it would not only tend to prevent the providing of the requisite facilities when necessary but would much increase the expense of those terminals when provided."

The authorities are in accord. It has been repeatedly held that "land not yet in use, but reasonably acquired for future use, may be allowed as part of the rate base." Brooklyn Borough Gas Co. v. Prendergast (D. C. N. Y.) 16 F.(2d) 615, 626; Southern Bell Telephone & Telegraph Co. v. Railroad Comm. (D. C. S. C.) 5 F.(2d) 77; Consolidated Gas Co. of New York v. Newton (D. C. N. Y.) 267 F. 231; Whitten-Wilcox, Valuation Public Service Commission (2d Ed.) vol. 1, p. 805.

In Pacific Telephone & Telegraph Co. v. Whitcomb (D. C. Wash.) 12 F.(2d) 279, 288, affirmed in Denney v. Pacific Telephone & Telegraph Co., 276 U. S. 97, 48 S. Ct. 223, 72 L. Ed. 483, it was held: "Utilities which are equal to its present requirements may be grossly inadequate in the reasonably near future. Public service companies cannot wait until their facilities break down or prove unequal to the demands upon them before making needful additions and improvements. Business judgment must be employed to anticipate reasonable future needs and to make provision for them in advance. This is essentially a matter of business management which may not be arbitrarily interfered with. There is nothing in the outlay to suggest dishonest, wasteful, or imprudent expenditure. The right of a public utility corporation honestly and in good faith to carry on its business and direct its affairs must not be wrested from it under the guise of rate making. In the absence of evidence to the contrary, investments may reasonably be assumed to have been made in the exercise of reasonable judgment."

These cases do no more than to apply the rule long settled that the power to regulate rates does not confer the power to manage. In State of Missouri ex rel. Southwestern Bell Telephone Co. v. Pub. Serv. Comm., 262 U. S. 276, at page 288, 43 S. Ct. 544, 547, 67 L. Ed. 981, 31 A. L. R. 807, the Supreme Court said: "There is nothing to indicate bad faith. So far as appears, plaintiff in error's board of directors has exercised a proper discretion about this matter requiring business judgment. It must never be forgotten that, while the state may regulate with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies, and is not clothed with the general power of management incident to ownership."

To the same effect see Banton v. Belt Line Ry., 268 U. S. 413, 421, 45 S. Ct. 534, 69 L. Ed. 1020; Chicago, M. & St. P. R. R. v. Wisconsin, 238 U. S. 491, 501, 35 S. Ct. 869, 59 L. Ed. 1423, L. R. A. 1916A, 1133; Northern Pac. Ry. v. North Dakota, 236 U. S. 585, 595, 35 S. Ct. 429, 59 L. Ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1; Interstate Commerce Comm. v. Chicago G. W. Ry., 209 U. S. 108, 118, 28 S. Ct. 493, 52 L. Ed. 705.

Opposed to this imposing array of authorities, counsel for the Secretary cite United Gas Co. v. Railroad Commission of Kentucky, 278 U. S. 300, 49 S. Ct. 150, 73 L. Ed. 390, and United Gas Co. v. Public Service Commission of West Virginia, 278 U. S. 322, 49 S. Ct. 157, 73 L. Ed. 402, affirming respectively (D. C.) 13 F.(2d) 510 and (D. C.) 14 F.(2d) 209. These cases involved gas rates. The West Virginia case was an appeal from an order denying an interlocutory injunction, and the court said that such an order would not be disturbed on appeal, unless plainly the result of an improvident exercise of judicial discretion. The Kentucky case, however, was an appeal from a decision on the merits. The utility owned 68,900 acres of producing gas property, and, in addition thereto, owned leases on undeveloped and unexplored territory to the extent of 746,000 acres. The cost of all of such property was $6,732,920, and that value was allowed as a part of the rate base. The utility contended, however, that the reserve acreage of 746,000 acres should be included at a present valuation of about $30,000,000, and undertook to prove that valuation by the estimate of engineers, which was based upon the assumption that gas would be found under such acreage in specific amounts, that there would be a market for it at a specific price, and that no law would be passed regulating the price at which it might be sold. The trial court held that there was no competent evidence of its present value. The Supreme Court of the United States affirmed the trial court in this respect. It will be observed, however, that the cost of this tremendous reserve acreage, of unexplored territory, was allowed in the rate base.

In the West Virginia case, the trial court, in denying the interlocutory injunction, held

that the 136,834 acres of proven territory was a sufficient reserve, and that the additional acreage of unexplored territory should not be included in the rate base. The case of San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 23 S. Ct. 571, 574, 47 L. Ed. 892, is likewise not in point. The Supreme Court, in construing the statute of California, said that it could hardly mean that a waterworks system constructed for 6,000 acres should have a full return upon its value from 500, if those were all that it supplied, and in that connection the Supreme Court said: "If necessary to avoid that result, we should assume that only a proportionate part of the system was actually used and useful within the meaning of the statute." In Spring Valley Waterworks v. City and County of San Francisco (C. C.) 192 F. 137, it appeared that the waterworks company had purchased all the potential reservoir sites and water rights within 50 miles of the city. The company undertook to include these in the rate base on the ground that they might be needed in fifty years. They were excluded largely on the ground that these rights were acquired for the purposes of monopoly. In Consolidated Gas Co. v. City of New York (C. C.) 157 F. 849, vacant land was excluded because the court found that there was no intention on the part of the utility to use the extraordinarily valuable vacant land for the purposes of expanding its business. In that case the rule is stated that vacant land, not used in the business, should not be included as a part of the rate base, "unless it is shown that its use will necessarily be required in the near future."

We conclude that the Secretary erred in excluding these tracts of ground from the rate base. The Secretary should make a finding as to the present value of such lands, and the taxes thereon should be included as a part of the operating expenses.

▮ (b) *Railroad Right of Way*. Railroad side tracks are indispensable to the operation of a stockyards. The petitioner, early in its history, acquired lands for right of way purposes, and constructed switch tracks thereon, and now owns the same. These were excluded by the Secretary on the ground that such tracks were not used as a part of the stockyards business, but as part of the business of transporting cattle. The statute defines stockyards services as services or facilities furnished in connection with the "marketing, feeding, watering, holding, delivery, shipment, weighing, or handling in commerce, of livestock." (7 USCA

§ 201.) It is true that the railroad companies use these side tracks, pay for the use thereof, and pay the stockyards company for its services in unloading the cattle. It is likewise true that, until they are unloaded, the cattle are still in the custody of the railroad company, and that their transportation is not ended. This, however, does not answer the question. The Stockyards Act includes, among the purposes of the business, the shipment and handling of live stock in commerce. It is not claimed that the petitioner could require the railroad companies to build such side tracks, at their own expense, as the stockyards company might from time to time desire. The power conferred by the Interstate Commerce Act to require extensions of lines (49 USCA § 1 (21) does not extend to industrial side tracks (49 USCA § 1 (22); such power is not to be implied. Interstate Commerce Commission v. United States ex rel. Los Angeles, 280 U. S. 52, 50 S. Ct. 53, 74 L. Ed. 163; Western & Atlantic v. Public Comm., 267 U. S. 493, 45 S. Ct. 409, 69 L. Ed. 753. It is clear, however, that, if the stockyards company builds its own side tracks, the railroad companies may be required to furnish switching connections (49 USCA § 1 (9). Schlicher v. Director General, 62 I. C. C. 181, and Winters Metallic Paint Co. v. C., M. & St. P. Ry. Co., 16 I. C. C. 587. The petitioner had a right to construct and own its own side tracks, so that it might be assured that they were favorably located, and to avoid the delays and difficulties incident to some other method of handling the paramount problem of the prompt receipt and unloading of the live stock. There is convincing evidence in this record that it is to the marked advantage of stockyards companies to own the side tracks.

The respondents freely concede that properly located side tracks are indispensable to the operation of petitioner's business; no claim is made that, when these tracks were constructed or now, the railroads could have been required to construct them at their own expense. The sole reliance of the respondents is upon section 15 (5) of the Interstate Commerce Act (49 USCA), and the decisions applying it, which provide that railroad transportation ends only after the live stock is unloaded. Covington Stock-Yards Co. v. Keith, 139 U. S. 128, 11 S. Ct. 461, 35 L. Ed. 73. Respondents' brief states the position of the Secretary as follows: "If the railroad leases property of a stockyards in order to gain access to pens, the transportation service nevertheless ends at the place where the livestock is loaded

and unloaded. In other words, it is not the ownership of the land over which the spur track is constructed, or the legal obligation or absence of it to construct a spur track that determines whether such track is employed in stockyards or transportation service. It is rather the nature of the use."

There can be no doubt but that this trackage is used by the railroads in the discharge of their public duties. There is likewise no doubt that petitioner owns it, and has a right to own it, as a part of its stockyards facilities. The respondents assume that the same property cannot be used for two purposes—that of transportation and market. We cannot agree with this assumption; the fact is that the proper location of side tracks is a part of the services of marketing. The trackage here is indispensable both to the transportation and the marketing of live stock. It is in fact used and useful for both services. Since it is undisputed that the petitioner rightfully acquired this trackage, in order better to discharge its responsibilities to its patrons, and that such trackage is in actual use, it seems unfair to deny it a return thereon because perforce it must be leased. To relegate it to such return as it may be able to secure by an agreement with its lessee is to deny its right to a fair return. Such return as it does get should be restored to its income account.

If the Secretary's assumption is correct that stockyards service cannot commence until the railroad's duty is completed, then the Secretary, to be consistent, should have eliminated from the income account of petitioner an item of $23,042.13 (net after labor expense) which the railroads paid petitioner for services in connection with loading and unloading cattle. But the Secretary did not eliminate this item. The dispute over trackage is therefore without substance, for this item, plus the $10,585.74 rental, more than offsets a return on the trackage.

■ (c) *The Live Stock Show.* The petitioner owns and maintains land and buildings for the purpose of an annual live stock show, the show being operated by the National Western Stock Show Association, a separate corporation; the expenses of the show are borne by public subscriptions, but the stockyards company pays the taxes on the properties. The Secretary eliminated these properties from the rate base, saying: "Undoubtedly the livestock show is of educational value and of benefit to stock raisers, particularly to the raisers of pure bred livestock, but the extent to which it is general-

ly beneficial to all of those who patronize the Denver market is hypothetical."

Here again the evidence is undisputed. The Department of Agriculture is expending considerable sums of money in an effort to induce cattlemen to raise a better grade of cattle. A pickup calf, or a grade steer, will eat as much as a pure bred, but it will not bring as much on the market. The primary object of live stock shows is to convince the cattle raiser of the wisdom of raising the better grade stock.

The business of the petitioner is entirely dependent upon the live stock business in its territory. If that business perishes, the petitioner will perish. If that business flourishes, the petitioner will flourish. It is axiomatic that the live stock business will not flourish unless it is profitable. It will not be profitable unless better live stock are raised. In bending its efforts toward furthering the success of the live stock business in its territory, the petitioner is furthering its own business. Here, again, to deny the petitioner the right to earn a return upon these properties, is to deny it the right to bear a part of the expense of this stock show. Furthermore, the stock show attracts buyers, and, the more buyers that are bidding, the better the prices that are obtainable. It seems reasonable to assume that the better market afforded by the additional buyers attracts shipments that otherwise would go elsewhere, and the record apparently bears this out. It is also in evidence that other stockyards generally maintain similar shows. That the directors have maintained this show, in good faith and in the belief that it stimulates the market presently, and insures a more stable and better business for the future, is not questioned. The facts are not in dispute; the question is one of law. We are of the opinion that the petitioner has a right, in the conduct of its business, to own these properties for this purpose, and that it is not within the power of the Secretary to deny the petitioner the right to stimulate its business and to insure its future stability by denying to it a return upon properties used for that purpose. These properties should be valued by the Secretary, included in the rate base, the reserve for depreciation adjusted accordingly, the income from rentals restored to the income account, and the taxes thereon restored to the expense account.

### Yard Traders.

■ The Secretary finds that: "It has been shown herein that the structure of respond-

ent's existing schedule of rates and charges is such that, with the exception of livestock resold in the commission division, all yardage charges are assessed against and collected from those who cause the livestock to come to the stockyard; that those who purchase livestock within the stockyard fall into two general classes, namely, (1) those who purchase to remove it from the stockyard and (2) those who purchase to resell or otherwise trade in it within the stockyard."

The latter class of buyers are called "traders" or "dealers." Traders neither kill nor fatten cattle. They do not sell for a commission, but sometimes buy for the account of others. They supply a market when other markets fail. The trader picks up the slack, and is an indispensable adjunct to a ready market. Chief Justice Taft, in Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 402, 66 L. Ed. 735, 23 A. L. R. 229, held that "the dealers are essential to the sales to the stock farmers and feeders." A cattleman ships his cattle to a commission man for sale; upon the day of their arrival, the packers are supplied and are not in the market; the demands of the feeders (those who buy to fatten) are presently supplied. The cost of feed at the yards is high; the cattleman requires an immediate market, for he wants to get home. Here is where the trader steps in. He offers a cash market; he either holds the cattle for a few days and sells in the yards or ships to another market.

Under the present rate structure, the petitioner treats the two classes of buyers alike, that is, no yardage charge is imposed on either, but both pay a handsome price for feed. Under the present structure, the petitioner treats all shippers alike, that is, imposes but one yardage charge, whether the shipper is able to sell to a packer or whether he must sell to a trader. The Secretary's order changes this by requiring that the petitioner either charge the trader with one-half the regular yardage charge or stand the loss. The Secretary does not find that unlawful discrimination exists, for the order of the Secretary imposing but a half charge recognizes a distinction between the shipper and the trader. There is no basis for a finding of such discrimination, for the Secretary finds that the trader is one of the two classes of purchasers; and the existing rate structure treats both classes alike.

Has the Secretary exceeded his power, or invaded the managerial field, by requiring that petitioner exact a charge from yard traders and not of other buyers? The trader operates on a small margin of profit; this charge, if exacted, must necessarily be reflected in the price he pays to the shipper. Has the Secretary the power, therefore, to require petitioner to exact a higher toll from a shipper who must sell to a trader than from a shipper who sells to a packer?

That is the question presented. The petitioner contends that the marketing end of its business is more vital to the shipper than the physical custody of the cattle; and that it has the same right to furnish facilities to traders as it has to pay wages to its weighers and its drivers. The petitioner further contends that the trader serves as insurance against monopoly of the market by the packers, for he has the financial resources and the knowledge of other markets to enable him to reship if a local combination threatens. The evidence is abundant and undisputed that the trader is a vital cog in the machinery of marketing; the record discloses no complaint from any shipper as to the present practice.

The Secretary justifies this charge on account of the fact that, where cattle pass through a commission man to a packer, there is but one change of title, while, when cattle pass through a trader to a packer, there are two changes of title. That the question of title is the controlling one with the Secretary is indicated by the fact that such charge is not exacted against a trader who buys cattle upon the order of a feeder, nor upon the agent of a packer. It seems to us that the fact that legal title passes twice is not of controlling importance. In Stafford v. Wallace, supra, the argument was made that the passing of the title to the trader interrupted the flow of interstate commerce. In response to this argument, Chief Justice Taft said: "They create a local change of title, it is true, but they do not stop the flow; they merely change the private interests in the subject of the current, not interfering with, but, on the contrary, being indispensable to, its continuity. The origin of the livestock is in the West; its ultimate destination, known to, and intended by, all engaged in the business, is in the Middle West and East, either as meat products or stock for feeding and fattening. This is the definite and well-understood course of business. The stockyards and the sales are necessary factors in the middle of this current of commerce."

When cattle are shipped to the Denver stockyards, they are destined either for the packing house or the feeding pens. It is

a matter of no importance that, in the course of that journey, the title passes through a trader. The exaction of this charge against traders would simply mean that the shipper who is fortunate enough to have his cattle arrive on a day when feeders are at the yards, would pay less for the same service than another shipper whose cattle arrived the day after the feeders have left. In any event, it seems to us to be well within the power of the petitioner to exact but one yardage charge for the service rendered the shipper, whether or not the title to his cattle passes through the hands of a trader. It should always be remembered that the stockholders who have risked their means in this enterprise are entitled to some voice in its management. The business has its problems; the stockholders have selected trained and experienced men to solve them; if the directors have honestly adopted a reasonable business policy that is not unfair or discriminatory, we do not feel that the statute vests the Secretary with the power to require them to adopt an experimental policy that he should like to see tried out. It occurs to us that the settled and existing policy of the petitioner is sound; but that is not for us to decide. Neither is it for the Secretary; it is a question of business management, confided by the law and the decided cases, to the owners of the property. We conclude that the Secretary erred in charging against the income of the petitioner a toll which it does not exact, and which the Secretary has no power to require it to exact.

 There is a further objection to the amount of this charge. The Secretary arrived at the amount on the assumption that the one-half yardage rates would apply to 49,176 hogs, 254,411 sheep, and 278,360 cattle. There are no such figures in the record. It is stated in the petitioner's brief, and not denied by respondents, that these figures were taken from certain reports of the traders in the office of the Secretary. The petitioner insists, in its brief, that these figures are erroneous by at least 40 per cent., in that the figures of the Secretary included cattle handled by the traders, but never owned by them. In response to that, the Secretary, in his brief, says that the petitioner misconstrues the nature of the reports which are in the Secretary's office. The reports not being offered in evidence, and the record being barren of any information as to the correctness of these figures, or the calculations based thereon, we have no way of knowing which is right. If these figures had been introduced in evidence, the truth

could have been developed; in any event, we would at least have something upon which to form a judgment. As it is, we have nothing excepting the statements contained in the briefs. This is proof of the soundness of the rule that rights must be determined upon evidence presented. The rule is settled that rate-making bodies may not predicate their findings upon matters not offered in evidence. United States v. Abilene & Southern Ry., 265 U. S. 274, 44 S. Ct. 565, 68 L. Ed. 1016. For this additional reason the finding that $46,407.42 should be added to the income of petitioner is without support in the evidence, and must be set aside.

### The Test Period.

 In arriving at a determination of what return may be expected of rates that are promulgated for the future, it is proper to look to the experience of the past as a guide. For that reason, in all rate hearings, a test period is selected and a study made of the revenues and disbursements for that period. Ordinarily a test period of five years or more, if available, is selected. What the test period shall be depends on circumstances; for example, the years of the war are ordinarily excluded for the reason that such years are abnormal. Laying to one side such abnormalities, it is generally true that, the longer the test period, the more accurate the judgment for the future; the broader the base, the safer the estimate. When there has been a reasonably steady growth in the business, and reason to anticipate that it will continue, the factor of growth should be considered in estimating the future.

 The Secretary selected the single year of 1929 as the test period, notwithstanding the fact that that was the second largest year in the 45 year history of the stockyards. If the stockyards business showed a steady increase, without fluctuations, over that long period of time, the last and the biggest year might afford a reasonably accurate guide for succeeding years. But the proof in this case develops that such is not the history of the petitioner. The Secretary, in his brief, has prepared a graph showing the fluctuations in the business from 1915 to 1929. That graph discloses wide fluctuations from one period to another. On January 1, 1919, petitioner's income was about 33⅓ per cent. larger than it was on January 1, 1921; in 1916 and in 1921 the business was about the same; by 1924, it had regained the peak of January 1, 1919; but,

in 1926 it had dropped off to where it was in January, 1920. It then shows an abrupt rise until 1928, the largest year in the history of the business, with a small decline for the year 1929. The graph looks like a jagged mountain range and not the gradual rise of the plains country. The one year chosen is just beyond the peak of the last crest, the Continental Divide, as it were. A fairer test would have been to have leveled out the peaks and valleys, and estimated the future according to that mean line. In the graph referred to, such a mean line is drawn. Because the year 1928 was at the peak, and 1929 but slightly lower, that mean line is shown as ending in 1928. But, if history repeats itself, there will be other valleys in the future as there have been in the past; and, if the mean line is extended according to the gradual rise disclosed for the ten years indicated, the estimate of petitioner's earning power would be much less than is reflected in the findings of the Secretary. So projecting the mean line not only levels out the peaks and valleys, but also takes into account the anticipated general increase in the business. In petitioner's brief it is stated that the earnings for 1930 and 1931 were very much lower than those of 1928 and 1929, and indicate that history is repeating itself, and that the business is on the road down to another level such as is shown in the past. This statement is not open to our consideration. We are entitled, however, to consider the fact that since 1915 the history of the stockyards has disclosed peaks and valleys, and that it is not safe to conclude that there will be no more valleys. We are also entitled to consider, as did the Supreme Court in Atchison, T. & S. F. Ry. Co. v. United States, 284 U. S. 248, 52 S. Ct. 146, 76 L. Ed. ——, that there is a marked depression in business, of which we may take judicial notice.

There is ample evidence in the record that a fair estimate of earnings for the future cannot be predicated upon an examination of a single year of the past; that, in estimating earnings for the future, the business world generally studies the earnings for at least a five-year period in the past. That this is true is known by all who study the history of corporations for the purpose of determining the soundness of investments in their securities. This rule has received the approval of the Supreme Court of the United States. In the Knoxville Water Case, 212 U. S. 1, 29 S. Ct. 148, 152, 53 L. Ed. 371, the trial court based its estimate of the future upon the operations for a single year. The Supreme Court said: "We think it was error to confine the investigation to, and base the judgment upon, that year alone. The precise subject of inquiry was, what would be the effect of the ordinance in the future. The operations of the preceding fiscal year, or of any other past fiscal year, were valueless if the year was abnormal, and were only of significance so far as they foretold the future."

When the complete history of the business of the stockyards for a long period of years is available, we think it was error for the Secretary to predicate his rate upon the experience of a single and abnormally high year.

### Incidentals.

During the test year, the petitioner donated $223.11 "for philanthropic and other purposes." The Secretary finds that "it is customary for corporations to make donations for such purposes." This is, of course, true, for community chests, funds for the relief of unemployment, welfare associations, chambers of commerce, and other such by-products of civilized society must be supported by the business interests of the community. The Secretary excised $81.75 from the expense account of petitioner, because, in his judgment, the shippers and employees received no benefit from such donations. The amount involved is insignificant, and the items excluded are not readily identifiable. The test applied by the Secretary is rather narrow. If the stockholders or directors of a corporation are willing that their corporation do its part, in a reasonable way, in carrying the public load of the community the prosperity of which is closely interwoven with its own, it would seem to be an exercise of managerial power not subject to the veto of a public official concerned only with the protection of the public against extortion.

This rate hearing has put the petitioner to an outlay of $41,000. The Secretary declined to consider such item, or any part thereof, in his estimate of future expenses. This is the first such item in the history of petitioner; it is not safe, however, to conclude that it will be the last. One of the inherent practical difficulties that attends upon the "present value" basis for rate regulation is the shifting rate base; theoretically, the rate base fluctuates from day to day, as material prices go up or down; practical-

ly, a substantial variation occurs periodically, as the cycle of good and hard times takes its course. By the exercise of some talent for prophecy, based upon a careful study of the past, a rate base of some degree of stability may be ascertained. If so, fluctuations in income and outgo then do their part in disturbing the balance. No matter how fair the parties, nor how earnest may be their desire to avoid the waste of repeated rate hearings, the fact remains that some expense may reasonably be expected in the future. Some allowance, therefore, should be made. The suggestion of petitioner that this item be amortized over a period of five years seems to be within the bounds of reason; but that question, like the valuation of excluded lands, is for the Secretary's determination, in the first instance.

 In the brief for the Secretary, it is suggested that, even if the Secretary be wrong in certain particulars, the error can be compensated by decreasing his valuations of real estate, and eliminating certain allowances which he made. It is quite true that an error which does not affect the result should be disregarded. It is apparent, however, that the matters to which we have referred are not minor, and that they do affect the result. Conceding that 7½ per cent. is a fair return, it is a minimum, and the computations of the Secretary leave a very narrow margin for error. The restoration to the rate base of the excluded properties, or the elimination of the estimated income from the yard traders, or either, would bring the rate under the 7½ per cent. fixed by the Secretary. We cannot restore the excluded properties to the rate base, for it is the province of the Secretary, and not the court, to find the value of such excluded properties, and the amount necessary to provide for their depreciation. Nor is it the province of the court to select another test period, and, from a study of that, estimate the probable income and expenses for the future. Those are tasks for the legislative branch.

We are indebted to counsel for both parties for exceptionally helpful briefs.

It is probable that counsel can agree upon findings of the essential facts and conclusions of law, in accordance with this opinion. If not, let counsel agree as far as possible, and tender findings on points in disagreement. A decree will then be entered setting aside the order made and enjoining its enforcement.

SYMES, District Judge.

I concur in the result. On two questions discussed I regret I am not in accord with the opinion.

First. I am of the opinion that the Secretary was right in excluding from the rate base 6.861 acres of land owned by the stockyards company, together with the rails, ties, switches, etc., constructed thereon, and in holding that this property is not "stockyards facilities." This property is situated within the stockyards, and petitioner leases it to the railroads under a joint agreement whereby they pay for the use of the property, the cost of maintenance, repair and renewal of the tracks, and an additional sum to cover taxes and assessments. All transportation services and equipment are furnished and operated by the railroads as part of their business in delivering live stock from point of origin to the stockyards. In addition, the railroads pay petitioner for the unloading of each car, and absorb these charges.

The Secretary based his ruling on the ground that the hauling of live stock up to and away from the loading platforms is a transportation service for which the carrier is paid by the shipper. The petitioner's position is that it is a stockyards service necessary to the proper conduct of the stockyards business.

Petitioner is engaged in a business, the limits and character of which are specifically defined by the Act of August 15, 1921, c. 64, § 301 (7 USCA § 201), commonly known as the Packers and Stockyards Act: " 'Stockyard services' means services or facilities furnished at a stockyard in connection with the receiving, buying or selling on a commission basis or otherwise, marketing, feeding, watering, holding, delivery, shipment, weighing, or handling in commerce, of livestock."

Section 302 of the same act (7 USCA § 202) defines a stockyard as a place consisting of pens or other enclosures and appurtenances in which live cattle, etc., are held or kept for sale or shipment in commerce. The word "shipment" has been defined as the loading and delivery of goods by the shipper to the carrier for transportation, and is completed when the shipper has parted with control over the goods to be shipped. National Importing & Trading Co. v. Bear & Co., 324 Ill. 346, 155 N. E. 343. It seems clear that there is nothing in this statute authorizing the petitioner to engage in the business of transporting cattle by rail

as part of its stockyard business. The fact that the transportation is for a short distance only does not alter the principle.

In Dimmitt-Caudle-Smith Live Stock Co. v. Railroad, 47 I. C. C. 287, at page 318, it is held that the transportation of live stock does not terminate until after the stock has been unloaded by the carrier into suitable pens, and that this duty requires the railroad to provide such facilities and means of reaching them, or else to hire those owned by others; that this is the duty of the railroads is recognized by petitioner in charging the railroads both for the use of its property, as well as unloading the cattle at its docks. See, also, United States v. Union Stock Yard, 226 U. S. at page 304, 33 S. Ct. 83, 57 L. Ed. 226.

The mere fact that there is a stoppage of the cars en route to the stockyards at a transfer track or other point is merely incidental, and does not break the continuity of the transportation from the point of origin to final destination. Nor does it make any difference that the stockyards company does not hold itself out as willing to carry live stock for the public. United States v. Union Stock Yard Co., supra. See, also, section 15, subdivision 5 of the Interstate Commerce Act (49 USCA).

It seems to be the law, therefore, that the use of the track over which live stock moves to and from the point of loading and unloading is for transportation; so it follows that the value of such property should not be included in the rate base as property devoted to stockyards purposes. Furthermore, it is theoretically, at least, included in the rate base of the railroad companies.

It must be assumed that the charges the shippers pay the railroad company for transportation cover both the rental paid by the railroad for the use of this property, and the charge the stockyards company collects for unloading the cattle. If, notwithstanding this, the same property is included in the stockyards rate base, there is no escape from the conclusion that the shipper pays twice for the same service.

It is beside the point to argue that the stockyards need railroad facilities. While true, yet it is not peculiar to the stockyards business any more than it is to all other industries that are dependent on adequate transportation facilities, and, furthermore, we have recognized this proximity to the railway as a factor in valuing petitioner's real property.

It is argued it is a great advantage to the stockyards to own its own tracks. This may well be, but we are not a legislative body. The case must be decided upon the powers and limitations found in the act, and the court has no right to thus increase the valuation and impose an additional charge to be paid by the producer, merely because in our opinion it is an advantage to the latter. It is Congress, and not the courts, to whom the parties must resort for correction of hardships, or unwise limitations imposed by the statute.

Second. The Secretary has held, in effect, that the petitioner should charge and collect a charge from yard traders on all sales made by them. I agree with his conclusion. It is undisputed that they received services from petitioner, used its property and facilities offered, and are engaged in business at the stockyard for a profit.

The statute provides, section 310 (USCA tit. 7, § 211), that: "Whenever after full hearing * * * the Secretary is of the opinion that any rate, charge, regulation, or practice of a stockyard owner * * * for or in connection with the furnishing of stockyard services, is * * * unreasonable, or discriminatory," he "may * * * order that such owner or operator (1) shall cease and desist from such violation * * * or collect any rate or charge * * * other than the rate or charge so prescribed."

Clearly this is a matter of discretion, and, as there is some evidence in support of his position, the court should not substitute its judgment for his. Tagg Bros. & Moorhead et al. v. U. S., 280 U. S. 420, 50 S. Ct. 220, 74 L. Ed. 524. The arguments made against his finding are that the services of the yard trader are a benefit to the producer, and therefore the latter should pay for it. We, however, are concerned with the law only, and arguments of expediency are wholly immaterial to a decision of the questions here presented.

No discussion is necessary as to the amount of this charge, in view of the final result the court has arrived at.